## ELIZABETH S. BENNETT, by her Next Friend, Appellant, v. NEWTON WEST HIBBERT, Appellee.

1. **Wills:** TESTAMENTARY CAPACITY: EVIDENCE. In a proceeding to contest the validity of a will, it appeared that the testator was seventy years old and very sick and weak when the will was made, but was not, by reason of such infirmities, lacking in testamentary capacity. It further appeared that all through his manhood he had been a remarkably eccentric character; that he was profane, irreverent, atheistic, and of filthy habits; that at one time his dogs and cats ate with him at the table; that he played the violin when his wife was dead in the house, and slept on the rough box in which her coffin was to be placed, and was regardless of her comfort, and made heartless expressions concerning her during her last sickness; that he carried dirt in a basket from the highway to fill post holes and other places on his land; that he said he knew a man in England who could tell by necromancy where to find a stolen mare; that at one time he planted corn with a red handkerchief on his head, and, without any apparent reason, jumped and ran some rods and hallooed very loud; and that he did many other like eccentric and nonconventional things, nearly all of which, however, might be accounted for upon the theory of his natural inclinations, beliefs and education.

By the terms of the will he gave to an illegitimate daughter real estate valued at one thousand, two hundred dollars, and the remainder of his estate, amounting to some seven thousand dollars, he gave to a friend to whom he had become attached. To his brothers and sisters he left nothing. *Held*, that the evidence did not show a want of testamentary capacity.

2. ———: DEVISE TO ALIEN: VALIDITY. Under section 2, chapter 85, Laws of Twenty-second General Assembly, a nonresident alien may acquire and hold by devise real property to the extent therein named; the words "purchase" and "purchaser," as found therein, being used in their technical sense, and having reference to every method of acquiring title to real estate, except that by descent by operation of law.

3. ———: PROBATE CONTESTED: APPORTIONMENT OF COSTS. The probating of a will was contested by parties not named therein, but it was admitted to probate, and the costs of the contest were taxed to the estate. The plaintiff herein, one of the devisees, afterwards brought this action to set the will and the probate thereof aside, and to have her share of the realty absolved from the costs incurred in the first contest. She was in no manner a party to that contest, and the contestants therein expressly, by a proper writing duly filed, disavowed any purpose to interfere with the devise to her. *Held*, that, while the judgment of the court in this case, sustaining the will, was right, it was error to dismiss the plaintiff's petition in general, without granting her the relief which she asked as to the costs of the first contest.

*Appeal from Louisa District Court.*—HON. D. RYAN, Judge.

TUESDAY, MAY 16, 1893.

PROCEEDING to contest the validity of a last will and testament. There was a decree for the defendants, and the plaintiff appeals.—*Modified and affirmed.*

*Jayne & Hoffman*, for appellant.

*Newman & Blake, E. B. Tucker, L. A. Riley,* and *R. Caldwell*, for appellees.

GRANGER, J.—John S. Towndrow, deceased, in his lifetime made his will, which was, after his death, admitted to probate. The plaintiff, Elizabeth S.

Bennett, who brings this suit, by her next friend, alleges that she is the illegitimate child of John S Towndrow, and that she was so recognized by him in his lifetime generally, notoriously, and in writing. By the will of Towndrow the plaintiff was a devisee of certain real estate in Muscatine county, in this state. The remainder of his estate, real and personal was devised and bequeathed to the defendant, Newton West Hibbert. This action is, *first*, to set aside the will entire, because the testator had not testamentary capacity; and, *second*, to vacate it in so far as it devised real estate to Hibbert, because he was and is an alien, and disqualified to accept such provisions of the will in his favor. The important questions in the case are the recognition of the plaintiff so as to entitle her to inherit, the testamentary capacity of Towndrow, and the legal effect of the alienage of Hibbert. With our view of the case, it is only necessary to consider the last two questions.

I.  It is conceded that Towndrow was a remarkably eccentric man during his entire manhood. He died at the age of about seventy years. If we are to discuss the effect of the evidence to any extent, it seems quite necessary to set out some parts of it, as in no other way can its character be understood. The following is the direct testimony of some of the witnesses for the contestants of the will:

1. WILLS: testamentary capacity: evidence.

CHARLES ESTLE:—"Am thirty-three. Lived three-quarters of a mile from Towndrow, and knew him ever since I can recollect. Was not often in his company. Didn't see much of him the later part of his life. Was there the Monday before he died. Was at the funeral of his wife. Had a conversation with him about where he was to be buried in Muscatine county. I have heard him say that he was going to be buried under a big oak that he had up there; and then again I heard

him say that he had four trees, four oaks, all together, and he said that he was going to be planted in there. He was not buried there. Have been at his house and seen him eat. Once, just as I got there, he had dinner almost ready. He set the chairs around his table, and turned to his stove to get up some of his victuals, and while he was doing that the cats goes on his table and goes to eating the victuals, and he turned around and takes them down, and got everything on the table, and sets up and the cats gets up on each knee, and one beside him, and when he was eating he takes a piece for himself, and gives a piece to the cats and dogs. That's the way they would eat. At the time, the old lady was lying sick upstairs. She had a little bell up there that she would ring when she wanted anything, and the old lady rang the bell for something, and Jack paid no attention to it, and he spoke about her ringing the bell, and he paid no attention to it, but let it go, and didn't go up until he got through eating. Have heard him say that it would be better if he would take and knock his wife in the head."

Also ERNEST LEE: "Am twenty, and have known Mr. Towndrow ever since I can remember. Lived three-quarters of a mile from him the later part of his life. Saw him often, and conversed with him, and observed his talk. Our farms joined. Was at his house one night after the death of his wife, and before the burial. William Wilson was there. Remained all night. Towndrow was there. He remained up with us until 8 or 9 o'clock, and then he laid down and slept on the rough box all night. He didn't go to bed at all after his wife's death and before her funeral. He laid down in his clothing that night. I observed his conduct as very queer and curious; different from any other man I ever knew. One time I was sitting in the door and he was planting corn. He had a red handkerchief on his head. He jumped off, and ran

about twenty rods and hollered very loud.   Another time one of his horses got out and broke into our yard. I got on the pony and run him back, and he threatened to kill me for it.   He would take dry dirt from our field and carry it home.   His dog came across the field when my sister was sick and had died, and father killed the dog.   He came over and into the house as a gentleman and was all right until he seen the dog, and then he was wild.   He said the dog tried to talk with him.   He took it home and buried it by his front door.   Then, at the funeral, he raised up and screwed the coffin lid, and when they called on the choir to sing, he raised up, too. At the grave he threw a clod across the grave to draw my attention, and I went to him, and he said there was no use in wasting ground.   It was dug too far from the child's grave.   He said he would put a bottle in the coffin, and a letter stating the price of corn, and that they were farmers, and her name and age.   I have heard him pray and swear as near at the same time as anyone could.   That was on his death bed.   He says: 'See the Mrs. and angels around the Lord's throne; that is all right, my lad;' and then he began the Lord's prayer, and said that through, and almost in the same breath he swore an oath.   I think this was on the Friday night before his death.   I sat up with him some time during his last illness.   He was often wandering and flighty, and rambling in his conversation.   I didn't understand all the sentences and words which he spoke. This continued all the while during his last sickness. I was there Saturday.   Observed that he was no better. Was there on Sunday before the will was made, and observed that he was weaker, and no better.   The only change from Friday evening in his physical appearance was that he was weaker.   I heard him say that he had not drank a drink of water for three months. He drank wine, and had it about the house.   He kept a male hog about the house, and killed it, and burnt

the hair off, and afterwards ate part of it. I know of his roofing his stable in very severe winter weather. I have heard him say about limiting himself in various kinds of work. Heard him say about building so much fence, and that, if he didn't, the Lord Almighty would strike him dead. That, if God would let him live a hundred years, he would put a hill into his hollow. He was at work on that hollow. He used to say that if a man would tar his arms that he would live longer. I heard him tell (he told me) that one time 'Squire Brown was threshing for him, and he said it rained while they were there, and the lightning killed some sheep for him, and that he was swearing about the sheep or something, and that 'Squire Brown reproved him, and said he ought to be thankful that it didn't kill something more valuable. He said that he didn't thank God Almighty for killing his sheep, and if he killed his stock he might as well kill him. He was a man given to that kind of expressions. From what I observed of his conduct and have told, and from the conversations I have told, and what I observed as to his sickness, I would say that I don't think he was of sound mind."

It is not important that we should set out *verbatim* any of the testimony of the respondents. To some extent it is corroborative of the testimony for the contestants. About sixty witnesses were examined, nearly all of whom gave testimony as to the peculiarities, habits of life, and conduct of Towndrow, and, together, covering the period of his manhood. The testimony, taken together, does not show an insane mind, or one wanting in testamentary capacity. If the testimony is stripped of that which shows peculiarities common to a large class of men, of whose capacity to make a will there is no doubt, such as profanity, irreverence, expressions of disbelief in the existence of a God, filthy habits, a poor farmer, who sows, reaps and thrashes his grain later than others, and of a taste for gathering

different stones and grasses, we have left some very unu-
sual habits or actions, such as that his dogs at one time
ate at the table with him; that he played the violin when
his wife was dead in the house; that he lay on the
rough box in which was to be placed her coffin; that in
her sickness he seemed to be regardless of her comfort,
and made heartless expressions as to her; that he car-
ried dirt in a basket from the highway to fill post holes
and places on his land; that he said he knew a man in
England who could tell by necromancy where to find a
stolen mare; that at one time he planted corn with a
handkerchief on his head, and, without any apparent
reason, he jumped and ran some twenty rods, and
hallooed very loud, with other facts that we need not
enumerate. With the testimony in the case, these sin-
gular facts are stripped of much of their strange signifi-
cance, and nearly all are accounted for upon the theory
of his natural inclinations, beliefs and education. The
testimony is largely a culling from his many years of
life, of particular incidents arising in jokes or outbursts
of passion, such as it is the general experience of per-
sons now and then to witness. The instances are com-
paratively few in which a person lives to a similar age
from whose experiences might not be gathered a chap-
ter of incidents which, standing alone, would portray
the reverse side of their lives, as seen when the sunshine
and shadows are blended, and the truth made manifest
from a full and impartial showing. It is said that
Towndrow, at the funeral of his wife, turned the screws
in the coffin lid, and stood with the others during the
singing. The act of turning the screws in the coffin is
unusual, but not strange for such a man; and many a
sane person, with the burdens of such a trial, has done
things equally strange. The standing while singing
may have been a result of a choice or his judgment of
propriety. It is said that at the grave, to attract the
attention of a neighbor, he tossed a clod of earth across

it, and then spoke to him of the graves being too far apart, and taking too much room. Conceding the act to be out of the usual order, it is not an insane act, nor do we think it indicative of insanity, or a want of business capacity. There is scarcely a community without persons who, from carelessness, indifference to, or disregard for, conventional observances, would or might not be equally guilty of what is here urged as evidence of insanity.

M. J. Mee, who is next friend in this case, and a husband of the plaintiff's mother, is a witness, and has known Towndrow for eighteen years, and, after relating his observations, says he rode with Towndrow to the grave, at the burial of his wife, and sat in his lap; that on the way they had a conversation about renting land, but did not come to an agreement. He says that in his estimation Towndrow was very much of a joker. That fact is very manifest from the evidence. Mee further said: "Judging from the conversations and actions to which I have testified, and confining myself to that, I did not notice any change in him whatever. He was sound, so far as I know." He then states that he is not an expert, and that he thought, when Towndrow rose at the funeral to turn the screws in the coffin, he looked wild.

There is also testimony that when the will was made Towndrow was very sick and weak, because of which he was incapacitated to make his will. The testimony of the attorney who wrote the will, and of the physician who attended him during the last sickness, with others, satisfies us that he was then of a disposing mind, under the rule given to determine such a question. He gave to the plaintiff what the petition shows to be worth one thousand, two hundred dollars, and the remainder, some seven thousand dollars, to Hibbert. To the writer of the will he gave his reasons for

so doing. They had been lifelong friends, and Hibbert had made to him offers to care for his wife in England during her sickness that seemed to seal his former attachment to him, and he said he wanted him to have his property in America. The reasonableness of the will, however, is only to be considered in determining testamentary capacity. What claims the brothers and sisters of Towndrow may have had as objects of his bounty, other than the relationship, does not appear; but he gave reasons for preferring his friend in disposing of his property. In view of the record, with such a disposition, we should not interfere.

II. We are now to inquire as to the effect of Hibbert's alienage. This question involves the construction 2. ——: devise to of chapter 85, Acts of the Twenty-second alien:validity. General Assembly. The necessary parts of the act are as follows:

"Section 1. Nonresident aliens * * * are prohibited from acquiring title to or taking or holding any lands or real estate in this state by descent, devise, purchase, or otherwise, only as hereinafter provided," etc.

"Section 2. Any nonresident alien may acquire and hold real property to the extent of three hundred and twenty acres, or city property to the amount of $10,000 in value: providing, that within five years from the date of purchase of said property the same is placed in the actual possession of a relative of such purchaser, the occupant being related to such owner within the third degree of kindred, or the husband or wife of such relative; and, further provided, that such occupant becomes a naturalized citizen within ten years of the purchase of said property as aforesaid."

The controversy arises over the construction that should be placed on the proviso to the second section, and particularly as to the words "purchase" and "purchaser" as they occur therein. If the word "purchase"

is to be held as meaning the acquisition of land in pursuance of a sale for a consideration, the will, as to Hibbert, in so far as the real estate is concerned, is void. If, on the other hand, it is to be held that, within the legislative intent, a devise is a purchase, the will, in this particular, may be sustained.

By Code, section 45, it is provided: "Words and phrases shall be construed according to the context, and the approved usage of the language." It is certain that the word "acquire" will bear no such limited definition as "obtaining property under sale." We are not aware that the word has ever received such a construction, although it might easily have, under the rules for statutory and other interpretation, to meet the intent or purpose for which it was used; but in such a case the construction would be a limitation on its general legal acceptation. The act under consideration indicates to quite an extent the scope of the word "acquire" by prohibiting persons from "acquiring title * * * by descent, device, purchase, or otherwise." The word "purchase," in its legal acceptance, has repeatedly received judicial construction. In 19 Am. and Eng. Encyclopedia of Law, 571, it is said: "A purchase, in the ordinary and popular acceptation, is the transmission of property from one person to another by their voluntary act and agreement, founded on a valuable consideration. In its strictly technical sense it is the acquisition of land by any lawful act of the party in contradistinction to operation of law, and it includes title by deed, title by matter of record, and title by devise." In *Kohl v. United States*, 91 U. S. 367, it is said that, "technically, purchase includes all modes of acquisition other than that of descent." In *Burt v. Merchant's Insurance Co.*, 106 Mass. 356, the word "purchase" was held, in its legal acceptation, to include "every lawful method of coming to an estate by the act of the party as opposed to the act of the

law." Mr. Bouvier says, in defining "descent:" "This manner of acquiring property is directly opposed to that of purchase." The property of another, when taken by descent, is taken "as his heir at law." In 2 Blackstone's Commentaries, p. 287, is the following: "The most usual and universal method of acquiring a title to real estate is that of alienation, conveyance, or purchase in its limited sense, under which may be comprised any method wherein estates are voluntarily resigned by one man and accepted by another, whether that be effected by sale, gift, marriage, settlement, devise, or other transmission of property by the mutual consent of the parties." Chancellor Kent, in his Commentaries (volume 4, p. 509), speaking of "a purchase," says that, "in the judgment of the law it is the acquisition of land by any lawful act of the party, in contradistinction to operation of law, and it includes title by deed, title by matter of record, and title by devise." The cases and authors seem to have used the word "technical" in the same sense as "legal," or "the judgment of the law," in its application to the word "purchase." In *Re Gill's Estate*, 79 Iowa, 296, in construing the word "purchaser," as used in Code, section 2442, it is said: "The law recognizes but two ways of acquiring property, by descent and by purchase."

It only remains for us to determine whether the word "purchase" in the act shall receive its popular or its legal significance. It is very conclusive that if we give to it its popular meaning, and hold that the act only authorizes nonresident aliens to hold real estate by purchase for an actual consideration, then we must bring the word "acquire" into harmony with it, by placing upon it the necessary limitation for such a purpose. The act itself seems to forbid such a construction. The use of the word in the first section is in harmony with its ordinary and legal signification, and nothing in the purpose of the act indicates that it

is employed thereafter in a restricted sense. Nothing in the public history of the legislation, to our knowledge, warrants a conclusion that the evil or wrong sought to be remedied lay in a particular manner of acquisition by aliens, but in the fact of their becoming, to too great an extent, owners of land within the state. Is there even an imaginable reason why the legislature would provide that a landowner of the state might sell, for a consideration, his land in Iowa to a nonresident alien, upon the prescribed conditions of the law as to occupancy and future citizenship, and would not permit him to devise it upon the same conditions? The law fixes the conditions upon either the sale or devise, and the effects in the two cases are alike, so far as we are able to discover. The context of the law supports our conclusion as to the use of the word "purchase," and it is in accord with approved usage.

Counsel for the appellant, in support of their contention, quote from Sutherland on Statutory Construction (section 266), as follows: "When two words or expressions are coupled together, one of which generally includes the other, it is obvious that the more general term is used in a meaning excluding the specific one." If the rule has application it is certainly not favorable to appellant. "Acquire" would be the generic word or "more general term," and the rule would operate to exclude the word "purchase," which is the sole reliance of appellant in her contention. It is also said by the appellant that "a proviso will generally be considered not to enlarge, but rather to restrain, qualify, or explain the clause to which it refers." Our conclusion is an application of the rule. We limit the word "acquire," by the proviso, to what is in law a purchase, without which it would embrace the whole range of acquisitions, which includes all methods.

The arguments refer us to *Purczell v. Smidt*, 21

Iowa, 540, and also to *Greenheld v. Stanforth, Id.*, 595. The latter case was affirmed by operation of law because of a divided court, and the former case was, in effect, the same. The court was evenly divided, and an affirmance would have followed, but for an agreement to dismiss without prejudice. The cases are of no force as authority. See Code, section 140. Our conclusion is that the devise in the will is valid, subject to the conditions of the law imposed in such cases.

III. When the will was offered for probate, the brothers and sisters of Towndrow appeared, and 3. ——: probate objected on the ground of a want of testa- contested: ap- portionment mentary capacity. The issues were tried of costs. to a jury that returned a finding, which the court, for reasons not apparent, set aside, and granted a new trial. Thereafter the issues were submitted to the court without a jury, upon the testimony taken at the former trial. The conclusions of the court accord with our conclusions as to the testamentary capacity of Towndrow, and it sustained the will. The plaintiff in this suit was in no way a party to that proceeding.

After the new trial was granted, the parties attempted a settlement which could not be entirely effected, and it was agreed to submit the question of testamentary capacity to the court, as was done, and that, if it sustained the will, then Hibbert was to convey the property of the estate to a brother of Towndrow, and receive therefor one thousand, eight hundred and forty dollars, clear of all expenses on the trial. By the agreement the costs and attorneys' fees were to be taxed to the estate. After the will was admitted to probate, each party claimed one thousand dollars as attorney's fees. Contestants resisted the claim of proponents, and the question of the amount of such fees was submitted to the court, and seven hundred dollars.

was allowed. The aggregate of one thousand, seven hundred dollars as attorneys' fees, and upwards of three hundred dollars of other costs, were taxed to the estate. It should be stated that it does not appear that the court knew of the terms of the stipulation. The petition asks, in substance, that the interest of the plaintiff in the estate, whatever that interest may be, be freed from the effect of said judgment. With our holding as to the capacity of the testator, the plaintiff takes as a devisee under the terms of the will, and the contestants acknowledged, in the former proceeding, her rights to that extent by a direct pleading as follows:

"In the matter of the will and testament of John S. Towndrow, deceased. Now come contestants, and say that it is not now, and never has been, their purpose or intention to deprive Elizabeth Stanley Bennett of the equivalent of the legacy named in the instrument offered as the last will of the decedent. And, recognizing the laborious care of her mother, the niece of Mr. and Mrs. Towndrow, during the last and declining years of their lives, and the affection of Mr. Towndrow for Elizabeth Stanley Bennett, they tender here, and now confirm, the title to the west three acres and the east ten acres of the southeast quarter of section twenty-six, township seventy-six, range four, Muscatine county, Iowa, in and to Elizabeth Stanley Bennett, and ask the court to make and enter any proper record to this effect.

"NEWMAN & BLAKE.
"L. A. RILEY.
"Attorneys for Contestants."

The decree of the district court in this case, dismissing the petition as without equity, denies to the plaintiff relief from such taxation of costs in the former case. It is not, as seems to be the view of appellee in argument, a question of costs in this case. The relief

was plainly sought by averments in the petition put in issue by the answer. It is now too late to consider questions that should have been settled by objections to the pleading before answer, if there are such. The personal property of the estate is not sufficient to pay the charges against it, and hence the excess must be borne by the real estate, of which the plaintiff is, by the terms of the will, a part owner. We are not able to understand why this plaintiff should be burdened with any part of the costs or expenses of that proceeding. She was not there asking for any benefits, and the pleadings of the contestants preserved to her all that the will intended for her. She was not a party to the stipulation upon which the costs were taxed. With such a situation the stipulation upon which the costs were taxed should affect only the parties to it, and the record would not justify a judgment burdening her interest in the estate with costs, to the making of which she was in no way a party, nor in any sense responsible. The judgment of the district court should be modified to conform to this view.

This particular branch of the case has induced a very inconsiderable part of the record and argument. But one witness was examined as to such facts, and some documentary evidence was introduced. Because of this modification, twenty-five dollars of the costs in this case will be taxed to appellee.

The judgment is modified and AFFIRMED.