IN RE ESTATE OF FRED F. BURRELL, deceased.

JOAN MYRLEE FLACK, contestant-appellant, .v. ETHEL HILLGESON, proponent-appellee.

No. 49852

(Reported in 100 N.W.2d 177)

186

DECEMBER 15, 1959.

Milroy, Milroy & Milroy, of Vinton, for contestant-appellant.

Bordewick & Fischer, of Vinton, for Ethel Hillgeson, proponent-appellee.

PETERSON, J.—Fred F. Burrell was an active and prosperous cattle buyer in the Vinton area for about forty years. His home was in Urbana. He was a good businessman and accumulated an estate of approximately $75,000. It consisted of one-half interest, with his brother, in 603 acres of land, which was worth approximately $45,000. His home, worth about $10,000, and the remainder of the estate was cash in the bank.

In the year 1945 he had a paralytic stroke, affecting his left side. His left arm became useless and the only manner in which he could walk was by placing a brace on his left leg. The stroke did not interfere with his mental condition; however, that is the question involved in the case. He was nearly 65 and after the stroke retired from his business of cattle buying and management of his farms. He rented his one half to his brother for cash rent.

Mrs. Burrell lived until 1953 and before her death was able to give him such attention as he needed. After her death his

niece, Ethel Hillgeson, and her husband moved from their home across the street into his home to care for him. They lived there about fifteen months when they moved back to their own home.

Thereafter, they arranged for care by a young man, who came in the morning and evening for several months to help him out of bed and get dressed, and help him to bed. The local restaurant sent in his meals. For approximately the last two and one-half years of his life he arranged with a friend, Harley G. Lahue, to give him this attention. Mrs. Hillgeson supervised his care and whenever he wanted to go someplace on business, social calls, or for a ride she would take him in her car. This happened frequently.

On July 16, 1955, he executed the will involved in this case, leaving $500 to his great-grandson, Mark Flack, and the balance of his estate to his niece, Mrs. Hillgeson. His granddaughter, Joan Flack, who was his only heir, contested the will. Upon trial the court directed a verdict against contestant. She has appealed.

Appellant raises three questions. 1. That in its ruling the trial court failed to comply with the provisions of rule 118, R. C. P., as to separate ruling on each ground of the motion for directed verdict. 2. The trial court erred in holding as a matter of law there was not sufficient evidence to submit the question of mental incapacity to the jury. 3. The trial court erred in holding as a matter of law there was not sufficient evidence to submit the case to the jury on the ground of undue influence on the part of Mrs. Hillgeson.

I. Rule 118 provides: "A motion, or other matter involving separate grounds or parts, shall be disposed of by separate ruling on each and not sustained generally."

The motion for directed verdict filed by proponent was divided into four sections. Section 3 was divided into paragraphs A to M inclusive. Section 4 into five paragraphs and paragraph 5 was subdivided into eleven paragraphs. While it is true there were many paragraphs in the motion, only three principal questions were covered. First, that proponent had fully met the burden of due execution of the will. Second, the evidence was insufficient as to proof of mental incapacity. Third,

the evidence was not sufficient as to proof of undue influence on the part of proponent.

When the ruling of the court was entered it divided its ruling into such three parts. The court discussed each part definitely and at length, and in consideration of each part or ground the court held that the motion should be sustained. After sustaining the motion as to each part, in its final paragraph the court said: "Proponent's motion for a directed verdict and each ground and paragraph thereof separately and individually are sustained."

The contention of appellant apparently is that a more detailed explanation was required by the court as to separate ruling on each ground. We cannot agree with this position.

The purpose of the rule is that the party against whom the verdict is directed is entitled to knowledge as to the basis for direction of a verdict against such party. Cook, Iowa Rules of Civil Procedure, Volume 1, page 752; Pansegrau v. Collins, 247 Iowa 632, 75 N.W.2d 249; Nesci v. Willey, 247 Iowa 621, 629, 75 N.W.2d 257, 262.

In Nesci v. Willey, supra, this court through Chief Justice Larson stated: "The purpose of rule 118, R. C. P., insofar as it applies to motions for directed verdict, is to enable the parties litigant to know the ground sustained by the trial court as well as to limit the issue on appeal to this court."

In the case at bar the court not only considered each of the grounds of the motion in detail, but gave explicit reasons for its ruling as to each ground.

The trial court was sufficiently specific to comply with rule 118, R. C. P. Slight variation, if any, was not prejudicial to contestant.

II. Attorney Keith Mossman and Mrs. Phyllis Turner testified as to the due execution of the will. On their testimony the will was admitted in evidence. By agreement of the parties, John Rupp was appointed special administrator.

In view of the contest, the circumstances surrounding the execution of the will are important. On July 12, 1955, Mr. Burrell asked his niece, Mrs. Hillgeson, to take him in her car to the office of Mr. Keith Mossman, an attorney at Vinton. She stopped

in front of the office. Mr. Burrell, because of his physical condition, was not able to climb the stairs to the office so he asked her to ask Mr. Mossman to come down to the car. When he came, testator asked Mr. Mossman if he would come to his home in Urbana in the next few days to write a will for him. Mr. Mossman fixed July 16 at 10 a.m. as the time at which he would be there.

On that day he drove to testator's home with Mrs. Turner, his secretary. He took a typewriter with him. They walked into the living room and found Mr. Burrell and Mr. A. L. Hendryx present. In a few moments Mr. Harley Lahue came in. Mr. Burrell explained to Mr. Mossman that these two gentlemen were good friends and he wanted them to act as witnesses. Mrs Hillgeson was not present in the room. She was out in the kitchen. Shortly after the parties came she announced she was going next door to her parent's home. Mr. Burrell in the presence of all four parties told Mr. Mossman what he wanted in his will. Mr. Mossman then dictated the will according to Mr. Burrell's instructions. His secretary went out in the kitchen and wrote it on the typewriter. When she brought it back into the parlor Mr. Mossman read it to Mr. Burrell in the presence of the other three parties. Testator remarked that it was just exactly as he wanted it.

Mrs. Hillgeson came back into the kitchen just before Mr. Mossman read the will to her uncle. She, therefore, heard the contents of the will. She came into the parlor and said "Uncle Fred, are you sure this is what you want to do?" His reply to her question was in somewhat profane language because he said: "Your .... .... right." The four people present all signed the will as witnesses.

Mr. Burrell asked Mr. Mossman to take the will with him and keep it in his possession, which he did until after Mr. Burrell's death.

Mrs. Turner's testimony was substantially the same.

III.   A brief synopsis of the testimony tendered by contestant is advisable.

John Rupp testified: He knew Mr. Burrell since childhood. Made his income tax returns from 1941 to 1948. He thought Mr. Mossman made them thereafter. He visited with him occasion-

ally. He produced his bank checks in court. Mr. Burrell signed all the checks. Testator gave the figures for income returns from his mind.

Joan Flack, the granddaughter, said: She lives in Boulder, Colorado. Moved from Iowa when ten years old. Married in 1951 to Ernest Flack, an engineer. Stopped to see grandparents in 1951. Stayed overnight. Saw her grandparents in Colorado in 1947, when they visited there for several weeks. At that time Mr. Burrell had had the stroke, and was in the hospital part of the time. She also saw him in 1946 or 1947 at Waterloo. He could walk with cane and brace.

Her father died in 1953 and she came back with her mother, for his burial at Urbana. The same year she came back for her grandmother's funeral. During the school year of 1953-1954 her husband was in school at Iowa City and she saw her grandfather often. In 1954 she moved to Boulder, and did not see her grandfather from September 1954 until after his death in December 1957. She came back for the funeral.

In 1954 she discussed with Mr. and Mrs. Hillgeson the matter of having a guardian appointed for her grandfather, but no action was ever taken. She received letters continually from him from 1954 until his death. They were written for him by Mrs. Hillgeson and signed by her grandfather.

He became weaker as the years passed by. She evidently had physical weakness in mind, because she never mentioned any mental weakness. Her testimony along this line was that when he reminisced about old times he would shed tears.

She said as to her grandfather: "He was quite a strong and determined man at times. * * * There were times he was depressed. * * * There were times he was not depressed. I sent my grandfather Christmas cards, and I wrote to him. * * * I did not send my grandfather Christmas presents as such. After 1954 I did not send him any birthday presents. Mr. and Mrs. Hillgeson arranged with the Miller boy to take care of my grandfather. For the last three years of his life Mr. Lahue took care of him."

Ernest Flack testified: He is contestant's husband. They were married in 1951. Visited Mr. Burrell often while at State University for one school year. Told about paralysis of left side

and his weakness. Was weaker in 1954 than in the forties. He had a conversation with the Hillgesons about getting paid for their work. This was when they were there in connection with the funeral of Mrs. Flack's father. On the matter of Mr. Burrell's crying, the witness said: "It is quite natural that a person would be emotional upon the death of his only son."

Mr. Berl G. Alcorn testified he had been a cattle buyer, associated with Mr. Burrell for many years. He often visited with testator. He described his physical weakness. He was asked if he thought Mr. Burrell was qualified to buy and sell cattle or to manage his farm from 1945 to 1955. His answer was in the negative.

Testator's brother, John, was called as a witness. He was the one who owned about 600 acres of land jointly with decedent. He went with him to Rochester in 1946 to go through the clinic. After 1948 he managed the farms, paying his brother rent for his one half. He was asked:

"Q. * * * Would you say he was, in your opinion, able to continue operating the farm himself after 1945? A. Well, he wasn't in any worse shape than I am now when he quit. I guess I have done it, and he could have done it too."

William F. Miller testified: He operated the Vinton Nursing Home. Mrs. Hillgeson brought Mr. Burrell to the nursing home November 9, 1954, thinking it might be a better place for him than his home. Here occurred the only matter in the record of peculiarity on the part of decedent. He refused to disrobe, saying he wanted to sleep in his regular clothes; that he did this at home. He had threatened to strike Mr. Miller and the nurses with his cane. They undressed him and put him to bed. At two a.m., Mr. Miller was called. Mr. Burrell had fallen out of, and rolled under, the bed. Over his objection he was put back in bed. He made many complaints about the place. Next day Mr. Miller called Mrs. Hillgeson to come and get him. She took him to his home, where he stayed, with help in the home, until he died. Mr. Miller answered one question which was quite significant.

"Q. Would you say in your opinion that either you or anyone else could easily influence him? A. I don't think they could."

A. L. Hendryx testified he had known decedent since he was 10 years old. He was an automobile dealer at Center Point. He was a friend and one of the witnesses on his will. He had many business dealings with him. He supervised the building of his new home in 1945. They often visited back and forth. Mrs. Hillgeson brought Mr. Burrell to Center Point to visit, sometimes as often as twice a week. Mr. Hendryx testified:

"When I visited him at his home in Urbana prior to July 16, 1955, his emotions were just about the same as he always had been. I never noticed any great difference in him. He appeared despondent at times. He would cry occasionally.

"Q. From your many observations of him, and limiting your question to the day of July 16, 1955, would you say at that time he was a man that was easily influenced by anyone? A. I never thought that Fred Burrell was easily influenced."

Loren Miller testified he cared for Mr. Burrell from October 1954 to spring of 1955. He helped him undress and get ready for bed in the evening, and helped him dress and get up in the morning. Mrs. Hillgeson had arranged for this care, but Mr. Burrell always paid him. He testified Mrs. Hillgeson took testator for a ride frequently.

Harley Lahue testified he was 40 years old. After Mr. Miller ceased caring for Mr. Burrell in 1955 he started to work for him, and continued until his death. He helped him morning and evening, and took care of his errands such as getting cigarettes, drugs, etc. He frequently visited during the day. He testified as to his physical condition:

"Q. The longer you stayed, the worse it became, is that correct? A. Well, I wouldn't say it got any worse. It was about the same.

"He would read a newspaper and magazines. He read the Reader's Digest. He was interested in the present price of cattle and discussed that with me. He looked in the paper for the current price of cattle."

Mr. John Suchomel, his banker, testified only as to his bank account. His balance was $19,922.25.

In addition to his testimony concerning due execution of the will, Mr. Mossman also testified that on the twenty-fourth day of July, 1956, Mr. Burrell came to Vinton. This was a year after

the execution of his will. Mrs. Hillgeson brought him in her car. She went to Mr. Mossman's office and asked him to come down to the car because Mr. Burrell wanted to see him. He talked with Mr. Burrell in the car for about an hour. Mrs. Hillgeson was not present during the conversation. Mr. Mossman then prepared an agreement which is an exhibit in the case. It provides in substance that Mrs. Hillgeson had cared for Mr. Burrell since 1953 and he wanted to be sure that she was paid for her past care and for her future care of him during the remainder of his life. No figures were mentioned, but he provided that she should be paid out of his estate, a just and reasonable compensation for all services rendered and to be rendered and that the executor of the estate should allow such a claim. Part of the consideration of the agreement was that Mrs. Hillgeson was to care for and look after him, and provide for his needs for the future. Mr. Mossman prepared the document and it was signed by Mr. Burrell and Mrs. Hillgeson. It was placed with the will in Mr. Mossman's care.

Appellant's counsel emphasizes this agreement as being strong evidence of mental weakness and undue influence. We interpret the agreement as an indication testator apparently wanted to make certain Mrs. Hillgeson was paid for her services, past and future; contest or no contest of the will.

IV. On this record appellant contends the case should be submitted to the jury as to the question of mental incapacity of the testator.

The test established, under many decisions, as to testamentary capacity is: the testator must: 1. Understand the nature of the instrument he is executing. 2. Know and understand the nature and extent of his property. 3. Remember the natural objects of his bounty. 4. Know the disposition he desires to make. We have approved this test in many cases. Some of the recent decisions are: In re Estate of Groen, 245 Iowa 634, 638, 62 N.W.2d 143; In re Estate of Moeller, 247 Iowa 174, 182, 73 N.W.2d 15, 19; Gillette v. Cable, 248 Iowa 7, 79 N.W.2d 195; Grahlman v. Grahlman, 248 Iowa 535, 81 N.W.2d 673.

Under the testimony, Mr. Burrell met this test. His careful preparation for the making of the will was evidence that he understood the nature of the instrument. He made the ar-

rangements for Mr. Mossman to come to his home to make the will. He arranged for two of his close friends to be present as witnesses to the will. He told Mr. Mossman what he wanted in the will. After it was written it was read to him and he stated it was exactly as he wanted it.

The testimony is replete with evidence that he knew the extent of his property. He only had three items of property. One was his undivided one-half interest in 603 acres of land owned jointly with his brother. After his stroke and the physical handicap which developed he decided not to manage the farms, but to rent his undivided one-half interest to his brother. There was testimony that he kept a keen interest in the farming project in that he continually wanted to go to the farms especially to see the cattle. His second item of property was his home. He was completely cognizant as to the home because he lived in it until his death. The third item of property was his bank account. He kept complete control of it until his death. Offered in evidence as exhibits were 146 checks signed by him between May of 1954 and July 25, 1955, which was after the date of the execution of the will. Every check was signed in firm, steady handwriting.

He knew the natural objects of his bounty. He left $500 to his great-grandson. It is true he did not leave anything to his granddaughter, the contestant herein, but he was fully aware of the fact that he had a granddaughter. He had Mrs. Hillgeson write letters to her continually and he would sign the letters. On December 7, 1957, which was twenty days before his death, he signed a check for $10 as a Christmas gift to his two great-grandchildren, Mark and Janice Flack, which was mailed to the granddaughter. It is an exhibit in the case. Janice was his great-granddaughter who was born about a year after the execution of the will.

Testator very definitely knew how he wanted to leave his property. In the presence of three witnesses and the attorney he told the attorney what he wanted in his will. When his niece raised a question with him as to whether he was sure the will was the way he wanted it he answered in very positive, somewhat expressive and definite language that it was.

Failure to call witnesses, expert or nonexpert, or failure

to ask questions of witnesses who · are closely and intimately acquainted with testator, as to question of mental incapacity, militates against contestant. In re Estate of Ransom, 244 Iowa 343, 57 N.W.2d 89; In re Estate of Ruedy, 245 Iowa 1307, 66 N.W.2d 387; Renze v. Renze, 247 Iowa 25, 72 N.W.2d 490; Bowles v. Bowles, 248 Iowa 930, 81 N.W.2d 15; Grahlman v. Grahlman, supra.

According to letters offered as exhibits in the case testator had several doctors during the course of his illness, resulting from the paralytic stroke. Not one doctor was called to testify concerning his mental condition. If testator was subject to serious mental incapacity the person who would know this, above all other persons, would be his doctor. Contestant called the brother of the testator, his banker, and four close friends, one of whom cared for him in the last two years of his life. They all visited him often. Not one of these witnesses was interrogated as a nonexpert witness as to his mental condition.

■■ A doctor as an expert witness can testify on the basis of his personal contact and observation of the testator, or on the basis of a hypothetical question involving all the facts as to the testator's condition. The rule as to a nonexpert witness was clearly stated in Gillette v. Cable, 248 Iowa 7, 14, 79 N.W.2d 195, 199: "A nonexpert witness may testify to unsoundness of mind *only after stating sufficient facts to support the conclusion.*" (Emphasis ours.) Neidermyer v. Neidermyer, 237 Iowa 685, 689, 690, 22 N.W.2d 346; Ipsen v. Ruess, 239 Iowa 1376, 1379, 35 N.W.2d 82; In re Estate of Ransom, 244 Iowa 343, 358, 359, 57 N.W.2d 89; In re Estate of Heller, 233 Iowa 1356, 1363, 11 N.W.2d 586; Olson v. Olson, 242 Iowa 192, 204, 46 N.W.2d 1, 40 A. L. R.2d 1.

It is probable the trial court would not have accepted the opinion of nonexperts, on the basis that there were not sufficient facts to support the conclusion. At any rate a vital link in the chain to support mental incapacity was absent.

■ V. The elements generally considered in connection with presence of undue influence are: Dominance over testator; condition of testator's mind as to whether or not he is subject to such dominance; general character of the disposition of his property; activity of dominant agent in connection with making

the will. In re Estate of Ransom, supra; In re Estate of Sinift, 233 Iowa 800, 10 N.W.2d 550; Perkins v. Perkins, 116 Iowa 253, 90 N.W. 55; 95 C. J. S., Wills, section 463(b)(1); Grahlman v. Grahlman, supra.

An analysis of the testimony does not sustain the presence of these elements in the case at bar. The dominant personality as between Mr. Burrell and Mrs. Hillgeson was the testator. It is true that for a period of twelve years between his stroke and his death he suffered from the effects of the stroke and was almost constantly confined to his home and to his chair. However, as his friends testified, he was a strong-minded man, he was cross and on occasions would become angry, but he always dominated the situation.

This situation also pertained as to whether his mind was subject to dominance as to the element of disposition of his property.

The evidence does not disclose any activity on the part of Mrs. Hillgeson in connection with the execution of the will. Outside of the attorney and his secretary, contestant tendered the testimony of ten witnesses. No witness offered any testimony as to any activity of Mrs. Hillgeson in connection with influencing testator to make the will which was made by him. The only testimony is to the contrary. She asked a question, heretofore shown, the general purport of which was that there was a question in her mind as to whether his will should be made as he had made it, and directed his attention to this doubt on her part. He drastically and profanely rejected her doubts.

VI. In a will contest case the evidence must disclose more than a scintilla of evidence to justify the trial court in submitting the case to the jury. Bales v. Bales, 164 Iowa 257, 145 N.W. 673; In re Estate of Kenny, 233 Iowa 600, 605, 10 N.W.2d 73, 76; 95 C. J. S., Wills, section 462b(1). In In re Estate of Kenny, supra, we said: "This court is committed to the doctrine that a mere scintilla of evidence will not sustain the burden of proof."

In Bales v. Bales, supra (page 276 of 164 Iowa), this court stated: "It was formerly considered necessary in all cases to leave the question to the jury if there was any evidence in support of the case, but it is now settled that the question for

the judge is, not whether there is literally no evidence, but whether there is any that ought reasonably to satisfy the jury that the fact sought to be proved is established. This rule has been adopted and followed in this state for many years."

The evidence offered by contestant in this case fails to measure up to the rules as established in many decisions of this court in requiring submission to a jury. It fails to extend beyond a scintilla of evidence as to both contentions of mental incapacity and undue influence.

The ruling and the judgment of the trial court in sustaining the motion for a directed verdict is approved, and the case is affirmed.—Affirmed.

All JUSTICES concur.