IN RE ESTATE OF RUDOLPH L. J. OLSON, deceased.

EMILY (EMMA) LUTZ, appellant, v. LOUIS J. KNOP, as alleged executor of Will of Rudolph L. J. Olson, et al., appellees; BETHLEHEM LUTHERAN CHURCH of Red Oak, Iowa. intervenor-appellee.

No. 50089.

(Reported in 106 N.W.2d 345)

November 15, 1960.

Rehearing Denied January 13, 1961.

Life, Davis & Life, of Oskaloosa, L. T. Genung, of Glenwood, and H. E. de Reus, of Knoxville, for appellant.

Cook & Drake, of Glenwood, for appellee L. J. Knop, as executor of estate of Rudolph L. J. Olson.

J. R. Swenson, of Omaha, Nebraska, for G. Oldenburg, attorney-in-fact for Yngve Osvald Persson, Jenny Paulina Nilsson, Thure Anton Persson, Gurli Karolina Nilsson, Ester Ingeborg Olson, Johan Mauritz Persson, Karl Henrick Persson, Erik Arthur Persson, Anna Margareta Sandell, and Arvid Gosta Olsson, appellees.

Leroy H. Johnson and Lavonne E. Billings, both of Red Oak, for Bethlehem Lutheran Church, Red Oak, intervenor-appellee.

PETERSON, J.—This is an action contesting the will of Rudolph L. J. Olson, on the grounds of lack of proper execution, undue influence and lack of testamentary capacity.

Rudolph Olson, age sixty-nine, a bachelor, was a resident of Malvern, Mills County, Iowa. At the time of death he was on a trip to Tucson, Arizona, and lost his life there on January 18, 1959, through an automobile accident. Both his parents predeceased him. He was survived by a sister as his sole heir, the contestant herein. She lived at or near Malvern until 1955, when she moved to Ottumwa.

October 25, 1952, Mr. Olson executed the following will:

## "LAST WILL AND TESTAMENT

"KNOW ALL MEN BY THESE PRESENTS:

"That I, Rudolph L. J. Olson, of Malvern, Mills County, Iowa, being of sound mind and memory, do hereby make, publish and declare this to be my last will and testament, revoking any and all wills by me heretofore made.

"FIRST: It is my will that my executor, hereinafter named, shall sell and convey all of my real estate, without appraisement or order of Court, and the proceeds from the sale thereof I give and bequeath to the children of my uncle, Per Olson of Tomelilla Skone, Sweden, living at the time of my death, in equal shares, share and share alike.

"SECOND: It is my will and I hereby give and bequeath the remainder and residue of my estate to the Bethlehem Lutheran Church of Red Oak, Iowa.

"THIRD: I hereby nominate and appoint Louis J. Knop as executor of my estate and ask that he not be required to give bond.

"IN TESTIMONY WHEREOF, I, the said Rudolph L. J. Olson, have subscribed my name this 25th day of October, 1952, in the presence of the subscribing witnesses hereto at my instance and request.

"/s/ Rudolph L. J. Olson

"We, the undersigned, subscribing witnesses hereto, at the instance and request of the above Rudolph L. J. Olson, in his presence and in the presence of each other, hereto subscribe our names as witnesses hereto this 25th day of October, 1952.

"/s/ Frances M. Hatfield

"/s/ Woodford R. Byington"

January 26, 1959, the will was duly probated, and Louis J. Knop, a banker, was appointed executor of the estate.

March 10, 1959, Mrs. Emily Lutz, his sister, filed contest. At the trial she offered no evidence on the grounds of lack of proper execution and undue influence. All evidence was directed to the question of lack of testamentary capacity. When contestant rested, the trial court directed a verdict in favor of proponents.

Contestant has appealed.

I. It is agreed by all parties that the well-known and oft-repeated rule as to the test of mental capacity is as follows: Capacity to (1) understand the nature of the instrument he is executing; (2) understand the nature and extent of his property; (3) remember the natural objects of his bounty; (4) know the disposition he desires to make. All four elements must be present. We cite a few recent cases: In re Estate of Rogers, 242 Iowa 627, 47 N.W.2d 818; In re Estate of Ransom, 244

Iowa 343, 57 N.W.2d 89; In re Estate of Moeller, 247 Iowa 174, 73 N.W.2d 15; In re Will of Grahlman, 248 Iowa 535, 81 N.W.2d 673; In re Estate of Burrell, 251 Iowa 185, 100 N.W.2d 177; Drosos v. Drosos, 251 Iowa 777, 103 N.W.2d 167.

There is no question but what testator, especially in later life, was odd and had idiosyncrasies, peculiarities and abnormalities. The question is, did they control testator to the extent that any of the four tests was absent when he made his will?

 The burden of proof rests upon contestant. In re Estate of Kenny, 233 Iowa 600, 10 N.W.2d 73; In re Estate of Sinift, 233 Iowa 800, 10 N.W.2d 550; In re Estate of Heller, 233 Iowa 1356, 11 N.W.2d 586; In re Estate of Klein, 241 Iowa 1103, 42 N.W.2d 593; In re Estate of Hadley, 241 Iowa 1280, 45 N.W.2d 140; In re Estate of Scanlon, 246 Iowa 52, 67 N.W.2d 5; In re Estate of Ransom, In re Estate of Burrell and Drosos v. Drosos, all supra.

II. We will summarize, briefly as to each witness, the testimony offered by contestant. Emily Lutz, contestant, testified:

Mother died March 18, 1950. Rudolph lived with her two years before her death. He attended country school and Malvern High School. He served in Field Artillery in First World War in Europe. After his return from the War he stayed home all the time. He let his hair grow long. He ate by himself at a separate table. He paid $527.50 to two men who claimed to be eye doctors and claimed to operate on his eyes. It appeared they were quacks and performed no operation. Parents joined Lutheran Church at Red Oak in 1910. Parents attended regularly after her father got a car. After she was married, she and her children attended a country church close by. Rudolph worked some on the farm. Contestant did not express an opinion that her brother was of unsound mind.

Roy Proctor, son-in-law of Mrs. Lutz, stated: He knew Rudolph for about 25 years. Rudolph raised pumpkins and lived on pumpkins only for a while; then the same with tomatoes. Once he wanted to return a suit to a merchant in Council Bluffs from whom he bought it. He could not find him, and it developed he bought the suit 25 years ago. Would strop his razor

from 30 minutes to an hour. He stopped and picked up boards and other worthless things along the road. Rudolph cut wood for the stoves. Kept the pieces all the same length. He did not know how much corn and oats were raised on his farm. At times he ate spoiled eggs. He never worked with farm machinery. Never had a car, but had horses. Went to a tractor school and to business college. Took piano lessons. Sometimes he would not talk for long periods of time. Rudolph went to California once and Arizona two times. In 1946 Rudolph deeded 34 acres to contestant which she accepted without any question as to his mental incapacity. "I cannot remember any specific thing about Rudolph in 1951-52-53-54-55." Rudolph wrote some sensible letters to his sister—some not sensible.

C. W. Redenbaugh testified: Was a field mechanic for Highway Commission. Lives at Tabor. His wife is related to contestant. Rudolph was always very quiet. He carved monograms, totem poles, etc. Saw Rudolph two or three times a year. He would not go hunting; or gather mushrooms. Could not get facial expression from him.

Mrs. Redenbaugh said: She is second cousin of contestant. Rudolph was very quiet. Told her father he left the farming to his tenant. He did not understand about war bonus. Patched his clothing—one patch on top of another. Never mingled with people.

R. O. Nimmo testified: Was president of Boyles-Van Sant College. Rudolph was there from 1952 to 1954. Rudolph came to the school when he was 62. Said he retired from farming and wanted an education. He was a lone wolf, and very conservative. Wore overshoes to save shoe heels. Vegetarian and had difficulty finding a place to stay in Omaha. Took 31 months for the course when normal time was 12 to 15 months. His clothes were well-worn and dirty. Did not carry on a regular conversation. Simply question and answer. Testified Rudolph was of unsound mind. Rudolph received following grades in his course: Accounting 95; Adding Machine 90; Office Methods 85; Business Law 97; Business Organization 94; Business English 98; Elementary Shorthand 99. From standpoint of accuracy he deserved the marks.

"Q. * * * So then now what you want to tell us is perhaps rather than being mentally unsound he was mentally deficient. A. I suppose he would be."

Mrs. Dale Laughlin: Her work was practical nurse. Was in the home two times in 1930s and once in 1943; total three months. Rudolph was very precise in learning the meaning of words. Carried a dictionary with him. Ate by himself and ate only tomatoes day after day, together with a ring of bologna. Continuously played on piano, even when his father was sick. Claimed someone put toads in the well. Patched and repatched his clothes. She testified he was of unsound mind.

Mrs. Josie Stotts: Was a neighbor in the country. Went through country school and Malvern High School with Rudolph. After he returned from service withdrew from gatherings and other people. Let his hair grow long. Testified he was of unsound mind.

J. E. Elleson testified: He is a retired businessman. Rudolph asked him to take him to Offitt Field to return some items he claimed he brought home when he worked there. A guard signed a receipt for the articles. They were nothing but junk.

Joseph G. Whiteside said: He had retired from working at Cudahy Packing Company. Went to school with Rudolph. Have seen him two or three times since 1951. Rudolph was odd. Saw him two or three times when in business school in Omaha. Saw a personality change in him after he came back from war.

Edna Proctor testified: She is a daughter of Mrs. Lutz. Noticed Rudolph let hair grow long. Kept to himself. Ate meals apart. Straightened nails for days. Ate spoiled eggs. His condition got worse. She said he was of unsound mind.

Evelyn Lohman said: She is another daughter of contestant. Rudolph ate at a separate table. Sharpen razor for hour at time. Would not speak at times and kept to himself. She testified he was of unsound mind.

Ruth Stocker testified: She is a daughter of Mrs. Lutz. Her testimony was about the same as that of the other daughters. She said Rudolph was of unsound mind.

Okay Peterson said: He is a farmer. He knew Rudolph. He did peculiar things. Patched his clothes. Learned to write with left hand as well as right. Went to tractor school. He ate alone. His writing was perfect. He was of unsound mind.

Dr. J. W. Rimel testified: He is a doctor at Bedford. He knew Rudolph as a boy. Last time he saw Rudolph was in 1920. Rudolph let his hair grow long after the war. On hypothetical question he said, in his opinion, Rudolph was of unsound mind. The elements contained in the question failed to form proper basis for the opinion.

■ Including her own testimony, contestant called fourteen witnesses to sustain her claim of mental incapacity. Five were related, either by blood or marriage. Four of the remaining eight did not offer any pertinent nor material evidence. Only eight witnesses, including her three daughters, stated as their opinion that testator was of unsound mind. Such testimony was only an opinion, and did not rise higher in weight and value than the evidence on which it was based. In re Will of Richardson, 199 Iowa 1320, 202 N.W. 114; Bailey v. Cherokee State Bank, 208 Iowa 1265, 227 N.W. 129; Bishop v. Scharf, 214 Iowa 644, 241 N.W. 3; In re Estate of Eiker, 233 Iowa 315, 6 N.W.2d 318. The testimony given by the witnesses expressing an opinion of mental incapacity furnished insufficient support for such an opinion.

III. From the evidence offered by and on behalf of contestant we can trace the life history of testator. Born to his Swedish parents, he developed as any other boy living on a farm. He attended country school and completed the grades. He then graduated from the four-year course at Malvern High School. He attended Augustana College for one year. He lived with his parents on the farm and performed some farm work.

World War I opened and he entered the service. Apparently at that time he had no physical nor mental condition which prevented him from serving his country. He was assigned to field artillery and served in France. Some testimony shows his oddities and peculiarities increased after he returned from War. He continued to live at home on the farm with his parents until after his father's death in the forties. In 1947 he moved

with his mother to Malvern. They maintained their home together until her death in 1950. He then came into full possession of the property which had been left to him by his father, subject to his mother's life use. This consisted of a farm of 163 acres, $11,000 cash, and two Malvern properties. Contestant inherited approximately the same amount of property. His father, who knew Rudolph better than anyone else, did not hesitate to leave the property to him, without trusteeship or restriction.

Testator continued to maintain his home in Malvern until his death. After his mother's death in 1950, he seemed to be restless for something to occupy his mind and attention. He could live on the income from his property, so he decided in 1951 to take a business course at Boyles-Van Sant Business College in Omaha. He finished in 1954. As heretofore shown he received very good grades. One witness testified his handwriting was beautiful.

He told the principal of the school he was a retired farmer and was taking the course for educational purposes and not to make a living.

To further occupy his mind, and as a matter of interest, he took a trip to California in 1955. In 1956 he took a trip to Tucson, Arizona. He again traveled to Tucson in 1957. While there he worked some at manual labor, and also took painting lessons. He stayed until 1958, when he lost his life in the automobile accident.

While he was attending the Business College in Omaha he came home week ends.

On October 25, 1952, which was a Saturday, he went to the office of his attorney in Malvern and had him prepare the will which is under contest. Significantly, he executed the will while he was getting excellent grades in business law.

From his mother's death in 1950 until his death, he rented, controlled and managed his farm of 163 acres; rented his other property in Malvern; invested his money so that the $11,000 increased to $13,000 at his death; did his banking business; attended Business College and Art School; paid expenses of three trips to the far west; and paid all his living expenses.

If, during his 69 years of life, testator ever consulted or was under the care of a doctor, for any illness, either mental or physical, the record does not disclose the fact. Even with his oddities, this is not the history of a man who failed to have the four requisites for execution of a valid will.

IV. We have often approved wills where the evidence has shown a much weaker mental condition than that of testator in the instant case. In re Will of Grahlman, 248 Iowa 535, 81 N.W.2d 673; In re Estate of Groen, 245 Iowa 634, 62 N.W.2d 143; In re Estate of Ruedy, 245 Iowa 1307, 66 N.W.2d 387; In re Estate of Shields, 198 Iowa 686, 691, 200 N.W. 219, 221; In re Estate of Sinift, 233 Iowa 800, 10 N.W.2d 550; In re Estate of Johnson, 222 Iowa 787, 269 N.W. 792; Bennett v. Hibbert, 88 Iowa 154, 55 N.W. 93.

We cannot decide a will contest on the basis of the possible testimony of witnesses not called. However, when several witnesses who knew the testator better than the witnesses who testified were not called, it is a significant circumstance against the claims of contestant. In re Estate of Ransom and In re Estate of Ruedy, both supra; Renze v. Renze, 247 Iowa 25, 72 N.W.2d 490; Bowles v. Bowles, 248 Iowa 930, 81 N.W.2d 15; In re Will of Grahlman and In re Estate of Burrell, both supra.

In In re Estate of Burrell, supra (pages 195, 196 of 251 Iowa), we said: "Failure to call witnesses, expert or nonexpert, or failure to ask questions of witnesses who are closely and intimately acquainted with testator, as to question of mental incapacity, militates against contestant."

In the case at bar contestant failed to call as witnesses the two bankers with whom contestant was doing business and who saw him regularly. She failed to call the tenant on his farm or the tenant in his house in Malvern. She failed to call any neighbors who lived in the vicinity of Rudolph's home. She failed to call any merchants on the main street of Malvern from whom testator constantly purchased groceries and other necessities of life and with whom he was constantly in contact.

The law is very slow to deny the right of any person to dispose of his property by will if he sees fit. Mere impair-

ment of his mental or physical powers so long as he retains sufficient mental capacity to meet the tests above set forth will not render his will invalid. In re Estate of Sinift, supra; Perkins v. Perkins, 116 Iowa 253, 90 N.W. 55; In re Estate of Rogers, supra.

Appellant bases her contention for reversal primarily on In re Estate of Rogers, supra. In that case the trial court directed a verdict and we reversed. Emma Cora Rogers was past eighty years of age when she died in 1948. She had been a widow for nine years. She executed the will in question on June 30, 1944. Carl S. Missildine, a well-known Des Moines lawyer, and his wife, who were close neighbors of decedent for many years, testified as to her increasing forgetfulness in the years immediately preceding the execution of the will. Mrs. Rogers talked with Mrs. Missildine about the death of Mrs. Missildine's baby, but she had never had a baby. She asked her about the health of her father, whom she had known very well, but who had died some time before the inquiry. She had constant fainting spells so serious that on several occasions Mr. and Mrs. Missildine thought she had passed away.

Willard Howe, a close friend of contestant, said Mrs. Rogers had frequent spells when she would sit and look into space for some period of time. She would ask the same questions over and over again. She would sit and pick her fingers and fingernails. She was irrational at times in 1942 and grew worse early in 1944 just before the execution of the will.

Mr. John H. Miller testified she was forgetful and nervous; would start a conversation, then switch to another subject before it was finished. It was not possible to carry on a coherent conversation with her.

Mrs. Anna Munden, a long-time friend, testified similarly with reference to conversations. Early in 1944 her mental processes were such that she did not finish her sentences. When the witness called on her she would insist on holding her hand and kissing same for a long period of time.

William H. Cook's testimony was similar as to the matter of conversations. Contestants and their spouses detailed many of her eccentricities: she would pick her fingers until they bled; she became unclean in her personal habits; she kept her cats

around the house and permitted them to soil her carpets; she soiled and wet her clothes; she did not recognize her grandson whom she had known well; her talk became blurred so she could not be understood. Two witnesses testified she had completely lost her memory and was like a little baby.

Dr. F. A. Ely, a qualified mental expert, testified in answer to a hypothetical question embracing all the facts that in his opinion she was of unsound mind on June 30, 1944. Several months after the execution of the will she suffered a cerebral hemorrhage and a guardian was appointed for her property. She lacked comprehension of the extent of title to, and ownership of, her property.

The question of undue influence was a prominent factor in this case. Her daughter, Mrs. Overton, the chief beneficiary under the will, came to the house and took her to the office of another attorney than the one who had been the attorney for many years of Mrs. Rogers and her husband. She first had Mr. Carl Burkman, the attorney, prepare a deed for several parcels of property which were placed in escrow with a banker, although not her banker. There was talk of a will when the deeds were prepared, but it was not executed at that time. Mrs. Overton brought her back to Mr. Burkman's office on June 30, 1944, and she executed the will. Mrs. Overton for some years prior to the making of the will had taken charge of Mrs. Rogers' property; rented it, collected the rents, and in general managed and controlled it. All negotiations with reference to rentals and repairs were carried on with Mrs. Overton or her husband.

On the basis of mental incapacity, as well as undue influence, this court held a jury question had been generated. The Rogers case is not comparable to the case at bar. No fundamental mental conditions and no undue influence such as outlined in the Rogers case have been established as to Rudolph Olson.

▮ We hold the evidence discloses testator had sufficient mentality to meet the four well-established tests. The order, and judgment thereon of the trial court, directing a verdict in favor of proponents is affirmed.—Affirmed.

All JUSTICES concur.