STATE OF IOWA, Appellee, v. BERT JOHNSON, Appellant.

No. 43597.

JUNE 15, 1937.

Earl R. Ferguson and H. S. Stephens, for appellant.

John H. Mitchell, Attorney General, Buell McCash, Spec. Asst. Attorney General, and Willis A. Glassgow, County Attorney, for appellee.

DONEGAN, J.—The defendant, Bert Johnson, was indicted for the crime of first degree murder committed on his father, Elmer Johnson, on the 31st day of December, 1935. Briefly stated, the facts connected with the crime charged are substantially as follows: The deceased, Elmer Johnson, lived with his wife, Frieda Johnson, and his son, Bert Johnson, on a farm operated by him and his son, about eight or nine miles west of Clarinda, in Page county. This farm was situated something more than a mile south of paved highway No. 3, which runs westward from Clarinda to Shenandoah, and between the paved highway and the Johnson farm there was an ordinary dirt road. On December 31, 1935, the deceased and his son, Bert Johnson, left their home in a Ford automobile, with a stock trailer attached, and proceeded to Maryville, Mo., for the purpose of attending a stock sale. No purchase was made at the sale and toward evening they started to return to their home. Their route home was by way of Clarinda where they stopped and visited a few minutes with another son of Elmer Johnson and then spent some time in two different beer taverns. Sometime between seven and eight o'clock in the evening, the Johnsons started westward from Clarinda on their way home, traveling westward on paved highway No. 3 until they reached the dirt road leading from the pavement to their home. They turned southward on this road and had proceeded between 400 and 500 feet when they came to a hill which they were not able to as-

cend, because it had rained some during the day and the dirt road was slippery. After the son, Bert Johnson, who had been driving, had tried unsuccessfully to get up the hill, he got out of the automobile and tried to push, while his father took the steering wheel. Instead of being able to get up the hill, the automobile and trailer slipped around until they went off the traveled part of the road into a shallow ditch on the west side thereof. During this time Elmer Johnson began to curse his son, called him vile names, said it was his fault, and said he would kill him. The son then said that he would go home and get a team and pull the automobile and trailer out of the ditch. Bert Johnson proceeded home and arrived there sometime between eight and nine o'clock. He harnessed up a team and hitched it to a low wagon, with flat-rimmed steel wheels, on which there was a box with sideboards and front endgate but no rear endgate. While at home he got a flashlight off a table and took a double-barreled shotgun and three shells from the pantry. While in the house he told his mother that his father had another one of his spells, that the automobile and trailer were in the ditch, and that he was taking the team and wagon to go to the place where they were and try to pull them out, and his mother said that she would accompany him. While at home Bert Johnson put two of the shells that he had taken from the pantry in the shotgun and put the other shell in the right pocket of his overalls. He procured a log chain from a granary, and he and his mother, both standing up in the wagon in which there was no seat, then proceeded toward the place where the automobile and trailer were stalled in the ditch.

While Bert Johnson was on his trip home to get the team and wagon, his father, Elmer Johnson, went to the home of a man named Henry Lawson, who lived on the south side of the paved highway about 40 rods east of its intersection with the dirt road leading to the Johnson home, and asked Mr. Lawson if he and his son would help get the car and trailer out of the ditch. Lawson and his son went with Elmer Johnson to the place where the car and trailer were in the ditch, and Eugene Lawson, the son, found that the ground cable to the battery of the car had become loose and he tried to fix it. He was able, however, to move the car only a few feet and was not able to get either the car or the trailer out of the ditch. About this time, the wagon in which Bert Johnson and his mother were rid-

ing approached from the south. As they came toward the place where the car and trailer were located, they did not stop, but proceeded northward to the intersection of the road with the paved highway, in order to make the turn, so that they would be facing southward toward their home. As they went past the place where the automobile and the trailer were in the ditch, Elmer Johnson had an automobile crank in his hand and in a loud voice he threatened to kill his son, Bert, at the same time calling him a vile name. As he did so, he approached the wagon from the west or left side of the road, in an apparent attempt to get into it, but slipped and fell in the mud. Mr. Lawson and his son remonstrated with Elmer Johnson and then proceeded to follow the wagon toward the paved highway on their way home. After the wagon had been turned around at or near the intersection of the dirt road with the paved highway, it proceeded southward toward the place where the car and trailer were in the ditch. As it approached this place, Elmer Johnson came toward it with the automobile crank in his hand, called the son vile names, and again threatened to kill him. Omitting, at this point, the details shown by the evidence, we confine ourselves to the statement that, while the wagon, in which Bert and his mother were standing up, was passing the place where the automobile and trailer were in the ditch, Bert Johnson discharged the two shells that were in the shotgun into the body of his father, then placed the other shell in the gun and discharged it into the head of his father, who was then lying down or in a squatting position on the road. The wagon was then driven a short distance southward to the top of the hill, where it was again turned around toward the north, and, with Bert and his mother standing up in it, proceeded northward past the place where Elmer Johnson was lying on the left or west side of the road, onto the paved highway, and cast thereon to the Lawson home, where Bert Johnson told Mr. Lawson what had happened. Mr. Lawson immediately called the sheriff, who arrived at the Lawson home a short time thereafter, accompanied by two other men, Hoskins and Gray. They were told what happened and the sheriff and his two companions and Bert Johnson proceeded to the place where the automobile and trailer were stalled. They there found the dead body of Elmer Johnson lying at the west side of the road, his head toward the northwest and his feet toward the southeast. While waiting in the sheriff's car for the

coroner to arrive, Bert Johnson told the sheriff, in the presence of Hoskins and Gray, how the shooting occurred.

Bert Johnson was arrested and taken to Clarinda, and later that same night he signed a written statement, in the presence of the sheriff, the county attorney, Max Gray, and J. E. Davidson. He was thereafter indicted and, upon the trial of the case, he was found guilty of the crime of manslaughter. A motion for new trial and exceptions to instructions were filed by the defendant and overruled by the court, and judgment was entered on the verdict rendered. From this judgment, and from all rulings of the trial court, the defendant appealed.

The record in this case is voluminous, and the briefs and arguments of both appellant and appellee are quite extensive. Appellant sets out seven separate allegations of error upon which he relies for a reversal. It is impossible to discuss in detail the conflicting contentions of appellant and appellee in reference to these alleged errors, and we necessarily confine our opinion to a consideration of the essential propositions involved.

▮▮▮ I. Appellant's first alleged ground of error is that the court erred in overruling the first ground of defendant's motion for a directed verdict, made at the close of the State's evidence, and renewed at the close of all the evidence. The portion of said motion which is here involved is as follows:

"The evidence utterly fails to meet the burden required by law of the State to negative the essential and necessary allegations of an indictment of this character charging this crime of self-defense, but on the other hand the evidence as produced in this case affirmatively shows the act was done in self-defense, anyway it is not negatived as required by law."

We confess that we have some difficulty in determining just what is meant by this ground of the motion, but we think that its meaning may be gathered from the brief points and argument in which it is contended that,—"If the State's case fails to show that the alleged slaying was not in self-defense, or in defense of another, the accused is entitled to a directed verdict of acquittal."

Conceding the rule to be, as claimed by appellant, that the burden was on the State to prove beyond a reasonable doubt, not only that the death of the decedent was caused by the act of the defendant, but also that such act of the defendant was criminal

and was not justifiable or excusable on the ground of self-defense, we think there was ample evidence in the record from which the jury could find that the State had sustained the burden thus imposed upon it. As stated in 30 C. J., 43:

"There are four recognized elements of self-defense as a justification or excuse for a homicide: (1) The slayer must not be the aggressor or provoke the difficulty which results in the killing; (2) as a general rule he must retreat as far as he reasonably and safely can before taking his adversary's life; (3) he must actually and honestly believe that he is in imminent danger of death, great bodily harm, or some felony, and that there is a necessity to kill in order to save himself therefrom; (4) and he must have reasonable grounds for such belief. The acts which accused may do and justify under a plea of self-defense depend primarily upon his own conduct and secondarily upon the conduct of the deceased. That is, in order that the plea of self-defense may be available, it must appear that accused did not provoke the difficulty and that he performed his duty under the circumstances to resort to all available means of escape or retreat; and where it appears that he was without fault up to the time of the homicide it then remains to determine from all the circumstances whether the conduct of deceased preceding and at the time of the killing was sufficient to justify accused in an honest belief as a reasonable man that he was in imminent danger of death or great bodily harm."

See, also, Wharton on Homicide (3d Ed.), section 223.

The evidence in this case was such that the jury could have found therefrom that the killing of Elmer Johnson by defendant was not done in self-defense or in defense of his mother, and could have found beyond a reasonable doubt that the defendant was guilty of the crime of which he was convicted. Not only were the statements made, at the scene of the crime, by the defendant to the sheriff and the two other persons who accompanied him, sufficient to negative the claim of self-defense, but, even the testimony of the defendant himself and of his mother, as to the acts of the defendant and the circumstances preceding and at the time of the shooting, could be considered by the jury as leading to a conclusion quite different from that contended for by appellant. The jury were the sole judges of the credibility of the witnesses and the weight they would give to the testimony

of each of the witnesses, and the court cannot interfere with the jury's finding if there is a sufficient basis in the evidence to support it. There was ample evidence as to defendant's own statement to the sheriff and the two other witnesses who accompanied him from which the jury could have found that the shooting was not in self-defense. The defendant's own evidence, as to his position in the wagon, the location of the gun in the wagon, the distance between him and the deceased, the manner in which he claimed to have fired the first two shots, his reloading the gun and firing a third shot, was such that, when contrasted with the explanation of the shooting given by him to the sheriff and his two companions, and with other undisputed facts, such as the position of the body after the shooting and the location of the wounds on the body, the jury might have cause to disbelieve it. We find no merit in appellant's contention that the evidence was not sufficient to support the verdict rendered.

**█ █ █** II. The second ground upon which the appellant asks for a reversal is, that the trial court failed to specifically instruct the jury as to the weight, importance, definition, interpretation, meaning and effect of impeachment, as applied to the defendant, who testified as a witness for himself. In connection with the cross-examination of the defendant, when on the witness stand, he was questioned as to contradictory and inconsistent statements made by him in a written instrument which was signed by him in the presence of the sheriff, county attorney and two other persons, either late on the night of December 31, 1935, or early in the morning of January 1, 1936. This instrument was signed by the defendant and was offered in evidence by the State, but was allowed to be introduced only for the single purpose of the impeachment of the defendant as a witness. The trial court gave an instruction in reference to this instrument, in which the jury was told that, ''This evidence was admitted solely upon the question of impeaching him as a witness. That is, such evidence may be considered by you as reflecting upon his credibility as a witness in this case, and for no other purpose whatsoever. You may give it such weight as you deem it justly entitled to and none other.''

In State v. Brandenberger, 151 Iowa 197, loc. cit. 205, 130 N. W. 1065, 1068, where complaint was made because the trial court did not give any instruction as to previous good character, this court, in refusing to reverse on that account, said:

"Now, while it is the duty of the court in a criminal case to fairly present the issues in its charge to the jury in order that they may have a clear and intelligent notion as to what they are to decide, yet it is not necessary that the court on its own motion instruct upon every matter arising in the case. While mere failure to instruct may constitute reversible error, if it should be apparent that this failure resulted in depriving defendant of a fair trial, yet, where the instructions given are correct as far as they go, the defendant should, if he desires further instructions, ask them, or he will not be heard to complain." (Citing cases.)

In the instant case, there was an instruction in regard to the evidence as to impeachment. After referring to the signed statement of the defendant, which was introduced, and to other statements against his interest, alleged to have been made by him, the instruction told the jury that this evidence was introduced solely for the purpose of impeaching the defendant as a witness, and explained the meaning of impeachment by further telling the jury: "That is, such evidence may be considered by you as reflecting upon his credibility as a witness in this case, and for no other purpose whatsoever." No request was made for any further instruction in regard to the instrument introduced or in regard to the question of impeachment. We think that, with the explanation given by the court in its instruction, the jury would have understood the purpose of the introduction of the written statement and the meaning of the word impeachment. Had the defendant desired a further and more detailed instruction in regard to these matters, he should have asked for it. In the absence of such request, we find no reversible error on the part of the trial court.

 III. Complaint is made that the trial court did not instruct the jury in regard to the right of the defendant to defend his mother from a felonious attack by the deceased. Attention is called to the 12th instruction, which referred to murder in the first degree, to the 14th instruction, which referred to murder in the second degree, and to the 16th instruction, which referred to manslaughter, in each of which the jury was told, among other things, that, before they could find the defendant guilty, the State must show: "That said killing of said Elmer Johnson was not done by the said defendant in lawful self-de-

fense under the rules hereinafter given you.'' In neither of these instructions was any express reference made to the defendant's right to kill deceased in defense of his mother, and the claim is made that, by omitting any reference to his right to defend his mother, the defendant was seriously prejudiced. Without passing on the question, we think there may be at least some doubt whether the facts in evidence in this case were such that the defendant could be found therefrom to have killed his father in defense of his mother. But, assuming that the facts were such as to make this a proper matter for instruction, we think it sufficient to say that the court, in each of the instructions above referred to, directed the jury's attention to ''lawful self-defense *under the rules hereinafter given you.*'' (Italics are ours.) In instruction 19, which dealt specifically with the matter of self-defense, the jury was told that ''the defendant had the same right to do everything in the protection of his mother that he could lawfully do in protection of himself,'' and, in instructions 20 and 21, which also dealt with the doctrine of self-defense, the same thought was clearly stated. We think the instructions concerning which complaint is made were such that, when taken in connection with instructions 19, 20 and 21, the jury was told and would readily understand that, if the killing was done in defense of his mother, the defendant could not be found guilty.

■■■ IV. It is alleged that the court erred in failing to fully and carefully instruct the jury that the defendant had a right to take into consideration and to justify his suddenness in his act of self-defense and in defense of his mother, because of his knowledge of the insanity and insane spells to which his father was subject, and which he was having at the time of the shooting by the defendant. Not only instructions 19, 20 and 21, already referred to, but also instructions 22, 22½ and 23, explained very comprehensively the doctrine of self-defense and its application to the facts of this case.

Certainly, the appellant was allowed great latitude in introducing, not only evidence as to the violent and quarrelsome disposition of the deceased, but also evidence as to specific instances of threats and assaults made by the deceased upon the defendant and his mother. In instruction 22½ the court told the jury that: ''In determining upon whether or not the said Bert Johnson acted at the time in question as a reasonably cau-

tious and prudent person would under like or similar circumstances, you should consider all the facts and circumstances surrounding such act. You should consider the matter in the light of *his belief of the necessity of his acts rather than on the fact of such necessity.*'' (Italics are ours.) In instruction 23 the jury's attention was specifically called to the evidence in regard to the acts of violence and threats and bad treatment by Elmer Johnson of the defendant and his mother, and to his quarrelsome and vicious disposition and insanity, and the jury was told that: ''This evidence was admitted because you should consider it in determining whether or not the defendant *was afraid of the said Elmer Johnson, and was in apprehension of danger from the deceased for his own life or that of his mother,* or whether or not *he stood in fear of great bodily injury* to himself or his mother from the said Elmer Johnson at the time he fired the said shot or shots.'' (Italics are ours.)

We think the appellant's rights in regard to the matters herein complained of were fully protected by the instructions given by the court. However, had the defendant required further instructions along this line, he should have requested the same.

**V.** The appellant complains of the court's failure to instruct the jury that the defendant had a right to be on the public highway with his mother at the time of the shooting; that he was not trespassing and was not in any place where he was forbidden, and claims that, because no such instruction was given, the court was guilty of error which was prejudicial to the defendant. We think the objection here presented is hypercritical, and that the instruction which the appellant contends should have been given was in no way called for by the evidence in the case. The right of the appellant to defend both himself and his mother from the attack which he claims was made upon them was fully explained to the jury in the instructions given in regard to self-defense. Defendant cites and seems to rely on a statement found in the opinion in State v. Borwick, 193 Iowa 639, 187 N. W. 460. The point involved in that case was the trial court's refusal to give an instruction that the defendant had a right to defend the passengers and guests in his car, as well as himself, from the assault made, and the case was reversed for that reason. There is nothing in that case which holds that, because a party is assailed on a public highway, he is at liberty to

kill his assailant without regard to the law governing self-defense. Moreover, no request was made for any such instruction. We find no error on the ground here alleged.

■■■ VI. Complaint is made of the court's failure to instruct the jury as to the importance and effect, in a murder case, as to who was the first assailant. In its instructions 19 to 26, inclusive, the court, in our opinion, quite fully and fairly instructed the jury in regard to every phase of the doctrine of self-defense, as applicable to the facts of this case. From these instructions the jury could and would easily understand that one who was assailed would have the right to defend himself, even to the extent of taking the life of the assailant under the rules laid down in these instructions. No specific complaint is made as to the incorrectness of any of the rules laid down in the court's instructions; the matter complained of was considered in these instructions; and no request was made for any further instruction along these lines. We find no error as to the matter concerning which complaint is here made.

■■■ VII. Finally, complaint is made that the State's assistant counsel, in his closing argument to the jury, over the objection of the defendant, made a clear misstatement of the record on a vitally important subject, and that this constituted prejudicial misconduct on the part of counsel for the state. The misstatement which it is alleged was made was:

"That Frieda Johnson was asked what the said Bert Johnson said when he came home and she stated that he said Elmer (or his father) had another one of his spells and he was going to kill him."

Appellant alleges in argument that this "was not a correct statement of the testimony of the said Frieda Johnson, that her testimony was that Bert Johnson had said that Elmer Johnson was going to kill him, Bert Johnson, and called the said Frieda Johnson in which she stated that when Bert Johnson came home he said in substance that Elmer Johnson was going to kill him—Bert Johnson." It is true that the testimony of Mrs. Johnson contained the statements substantially as alleged by appellant. It is also true, however, that the appellant's abstract of record shows that Frieda Johnson was called as a witness for the State and that, on direct examination, in testifying to what was said

by Bert Johnson when he came into the house and got the gun; she stated:

"I asked him what he was going to do with the gun, and he said that Elmer was up the road and had said he was going to kill him and that he had one of those spells again."

The appellant also filed an additional abstract which sets out what occurred when the assistant counsel for the State was making his closing argument. From such additional abstract the following appears:

"I want you to read what Mrs. Johnson testified to and I do all this in all fairness because I don't want to misstate one word.

"Q. Mrs. Johnson well now how long have you gone out of the house before you saw him again? A. When I went out of the house I asked him what he was going to do with the gun, he said Elmer was up the road and he said he was going to kill him.

"Mr. Stephens: We except to the statement of counsel Your Honor.

"The Court: That is their argument that it is in the record.

"Defendant excepts.

"And she told him she was going with him. Does that give this jury any idea of what this case is about, does that suggest to you anything about that a murder was to be committed that night?

"Mr. Stephens: We except to the statement of counsel that Mrs. Johnson testified that Bert Johnson said he was going to kill Elmer Johnson as not the facts in this record. On the other hand the statement of Mrs. Johnson was that Bert Johnson said to her that Elmer was having another spell and told him that he was going to kill him, Bert Johnson. That is the record.

"Mr. Davidson: Let the record show I had the reporter run this off and I read it from the record, I make the statement that this is what this woman testified to."

The appellant has not denied that this evidence appears in his own abstract and amendment to abstract; and he has not alleged that there is any mistake in either the abstract or amendment to abstract, or that the quotations from Frieda Johnson's testimony are not correct. In this situation, the statement appearing in the testimony of Mrs. Johnson, as shown by the abstract and amendment to abstract, must be taken as having been

made by her, even though it may be inconsistent with or contradictory to statements made by her in other parts of her testimony. It must be admitted that the statement of Mrs. Johnson, which is here under consideration, is such that an interpretation might be given to it that differs quite radically from that placed upon it by the appellee. However, we do not think that we can say that the interpretation placed upon this statement by appellee is clearly wrong, or that the appellee had no right to draw therefrom the inference for which he contended in argument.

On the whole case, the record indicates that the appellant had a fair and impartial trial, and, as we find no error in the judgment or rulings of the trial court, they are, therefore, affirmed.—Affirmed.

RICHARDS, C. J., and ANDERSON, KINTZINGER, PARSONS, HAMILTON, STIGER, and SAGER, JJ., concur.