STATE OF IOWA, appellee, v. WILLIAM PARKER, a/k/a WILLIAM ALEXANDER, appellant.

No. 51940

(Reported in 151 N.W.2d 505)

June 6, 1967.

Rehearing Denied September 22, 1967.

William C. Ball, of Waterloo, for appellant.

Richard C. Turner, Attorney General, and Stephen C. Robinson, Assistant Attorney General, for appellee.

STUART, J.—A Black Hawk County jury convicted defendant of second-degree murder in violation of section 690.1, Code of Iowa. He and Herbert Roby had quarrelled at a teen-age party in Waterloo. They confronted each other outside the home after the party. Roby was shot in the abdomen and chest with a .22-calibre pistol. The chest wound was fatal. Defendant admitted the shooting but claimed it was in self-defense. He testified he knew deceased had, on prior occasions, carried a razor and thought he was reaching for a razor when he shot him. He appealed from the judgment on the jury verdict and has assigned six errors.

I. Parker claims the trial court erred in admitting into evidence certain exhibits purporting to be some of the items of clothing worn by deceased at the time of the shooting and certain personal effects removed from the body at the autopsy. His objection was directed toward the foundation testimony relating to the identification and condition of the exhibits and was primarily based on an alleged failure to prove proper chain of custody.

"* * * it must appear that a continuous chain of control was exercised over any such exhibit which is offered into evidence, and that the exhibit was in substantially the same condition when offered as when seized. If there is sufficient proof that the exhibits offered were the same as those taken, and their contents were in the same condition when analyzed and introduced as when taken, they are admissible. The preliminary proof in this respect is for the court." (Citing cases) State v. Perry, 246 Iowa 861, 869, 870, 69 N.W. 2d 412, 417.

The exhibits in question are exhibit 6, a polo shirt; exhibit 7, a "T" shirt; exhibit 11, man's boxer shorts; exhibit 12,

trousers; exhibit 15, two black sox; exhibit 16, a billfold; and exhibit 17, a hairbrush and a medallion on a chain. There is evidence the deceased was wearing a black banlon polo shirt, a white "T" shirt and dark trousers at the time he was shot. A nurse who was present when deceased was brought to the hospital testified he was wearing a jacket (exhibit 5, not involved here), a short sleeved polo shirt type of sweater with a "T" shirt underneath. She identified exhibit 7 as the "T" shirt they cut away from deceased's injury. The supervising nurse testified no items of clothing other than shoes and a jacket were removed from deceased's body in her presence.

Deceased died in the hospital between 11:20 and 11:30. Dr. Paul O'Keefe, Black Hawk County medical examiner, arrived about 12:10. He found the body clothed in a dark blue heavy sport shirt, white undershirt, printed shorts and dark trousers. "The only items of personal property found on the body were a purse or billfold and a driver's license. * * * The clothing at that time was left on the body and the witness directed that the body be placed in the morgue of the hospital. At approximately 8:30 on the morning of the 7th of March, 1967, an autopsy was performed on the body and the clothing removed" under the supervision of the witness and given to the police. He identified the dark trousers by the penetrating hole in them. He did not attempt to identify any of the other exhibits further.

Officer Dirksen testified he was present at the autopsy. He took charge of the clothing and personal effects as the doctors removed them from the body, initialed each item and sealed it in an airtight bag. He saw the medallion around the neck of the deceased in the autopsy room. It was removed in his presence. He first saw the hairbrush on a small table in the autopsy room with the objects of clothing he was wrapping up. He identified each exhibit as the item received by him from one or the other of the two doctors conducting the autopsy and testified they were in substantially the same condition at the trial as when he received them.

There does not appear to be any question raised about the chain of control after these exhibits came into the hands of the

police. The break in the chain of custody about which defendant complains occurred between the time the medical examiner observed the body shortly after midnight and the time of the autopsy at 8:30 in the morning.

There is no testimony explaining how the body reached the morgue or what security measures were taken to prevent anyone from molesting it in the eight-hour interval. However, under all the circumstances here, we are not prepared to say this fact rendered the evidence inadmissible. The clothing removed from the body answered the description and condition of that observed on the deceased the night before. The bullet holes corresponded with the wounds on the body. It would be highly unlikely that anyone would have the desire or opportunity to come into the hospital morgue and change the clothing on the corpse. It would be hypertechnical to exclude the exhibits offered here under these circumstances. The body remained in the control of the hospital and would not have been readily accessible to outside personnel.

■■ Defendant contends the introduction of the billfold, hairbrush and medallion tends to prove deceased was not carrying a razor at the time of the shooting. No razor was ever found. While the defendant could argue it would have been possible for someone to remove the razor from the deceased's body during this eight-hour period, we do not believe this amounts to such lack of control or custody as to make the exhibits inadmissible. Possession of the body, clothing and personal effects thereon "was sufficiently accounted for by witnesses testifying on the trial to negative any reasonable claim that they had been changed or tampered with". State v. Whitbeck, 145 Iowa 29, 35, 123 N.W. 982, 984. The following cases are not factually similar, but in each instance we held there was a sufficient showing of a chain of custody and control. State v. Jones, 233 Iowa 843, 849, 10 N.W.2d 526; State v. Hodge, 252 Iowa 449, 463, 105 N.W.2d 613; State v. Drosos, 253 Iowa 1152, 1161, 114 N.W.2d 526; State v. Post, 255 Iowa 573, 581, 123 N.W.2d 11; State v. Perry, 246 Iowa 861, 869, 870, 69 N.W.2d 412.

In State v. Hossack, 116 Iowa 194, 202, 89 N.W. 1077, and

State v. Weltha, 228 Iowa 519, 524, 292 N.W. 148, the chain of custody was not sufficiently established. They are also factually dissimilar. See also 22A C.J.S. 946 et seq., Criminal Law, section 709.

II. Defendant claims his written statement exhibit 1 should not have been received in evidence because it was "unreliable, untrustworthy and not the true, accurate and complete substance of defendant's statements to Detectives Kane and Murray." He challenged the statement by a motion to suppress, objections to its admissibility and exceptions to instructions.

We do not understand he claims the statement was involuntary or that he was not adequately advised of his constitutional rights. The record would not support such claim. Defendant signed a "waiver" which informed him in writing of his rights and in which he acknowledged having been so advised orally. Officers Kane and Murray interviewed him for about one hour and forty-five minutes. His mother was present during the interview except for a brief period when she left the room after becoming ill. Murray took notes in longhand from which he typed the statement. It was intended to include: "* * * the basic facts of what happened, as to what the defendant said had happened, his version of what happened, is—actually in short form, is not our entire conversation. This is what he said to be true, what we took to be true from him." Before the statement was signed copies were given defendant and his mother. It was read to him and he had the opportunity to read it himself.

Parker claims exhibit 1 does not contain material statements favorable to him which he made during the interview. Two instances are called to our attention relating to circumstances supporting his claim of self-defense.

Exhibit 1 contained the statement that prior to the shooting deceased started walking toward defendant with his right hand in his pocket and "although Roby had his hand in his pocket, I never did see him with a gun or knife or any other weapon."

On direct examination Murray testified Parker first told

them: "deceased had a razor in his hand and after talking to him about the razor the defendant then said the deceased did not have a razor and did not see him with a weapon of any kind although the defendant did state that he had known the deceased to carry a razor."

On cross-examination Murray testified: "At no time during the evening did he ask the defendant whether he thought the deceased had a razor nor did he ask the defendant whether he thought the deceased had a razor because of the deceased's actions. * * * The witness did not ask the defendant whether he was suffering under the apprehension that the deceased had a razor that evening."

Officer Kane's testimony was substantially the same. Parker testified: "The police did not ask him why he shot the deceased. He told the police that he had known the deceased to carry a knife or razor. They asked him if he had seen a knife or razor that night and he told them, no, he had seen no weapon. He did tell them about the deceased putting his right hand in his pocket. The police did not ask him what he was thinking about or why he pulled the gun. * * * He actually told the police he had seen the deceased with a razor before but did not see him with a weapon on that night. The police did not ask him whether or where he had seen the deceased with a weapon before."

There is little dispute in the foregoing testimony. Defendant does not claim he told the officers he thought at the time of the shooting that deceased had a knife or razor. His complaint seems to be that the officers should have asked questions to elicit such answers. We know of no authorities which require statements to be complete in all details in order to be admissible.

▮▮ The statement made by defendant that he saw a knife or gun was not included in the written statement because he changed his story and it had no part in his final version of the incident. Had this been included, he might well have objected to its presence as an attempt to discredit him by showing his first inclination was to lie. Defendant told them everything included in exhibit 1 even if it does not include all defendant told them.

He also claims exhibit 1 is unreliable because it contains only the statement that defendant stepped on deceased's feet while he was dancing, rather than saying he "accidentally" stepped on deceased's feet. Both officers readily admitted on the stand that defendant had said he accidentally stepped on deceased's feet.

A statement does not have to be all-inclusive or without error or oversight in order to be admissible. "The manner in which a confession or admission of facts may be made is immaterial. It may be oral and partly written, or in narrative form or by questions and answers." (Citing cases) State v. Baker, 246 Iowa 215, 233, 66 N.W.2d 303, 313. Fragmentary admissions are common. Statements given by the same defendant may vary. Credibility, rather than admissibility, is involved.

Here Parker voluntarily signed this statement. It contains only information received from him. It may not be as complete as it could have been, but this does not make it inadmissible. He is free to point out any deficiencies and their effect upon its weight. Here, there is an unusual agreement among all the witnesses as to what was said. The statement was more nearly accurate than defendants are ordinarily willing to concede.

Jackson v. Denno, 378 U.S. 368, 84 S. Ct. 1774, 12 L.Ed.2d 908, 1 A.L.R.3d 1205, and Rochin v. People of California, 342 U.S. 165, 72 S. Ct. 205, 96 L. Ed. 183, 25 A.L.R.2d 1396, cited by defendant are concerned with involuntary confessions which were unreliable because they were coerced. There is no claim of coercion here and these cases are not applicable.

■ What we have said above applies with equal force to defendant's argument that the admission of exhibit 1 deprived him of constitutional due process of law. We do not agree that due process requires a full recording of all interviews. As stated above, there is less conflict about this interview than appears in most cases.

The trial court did not err in admitting defendant's statement into evidence.

III. At the hearing on the motion to suppress the statement, Kane was asked if there was any threat of the use of physical force. He answered: "No, sir; there wasn't needed any. I'd like to retract that. There's never been any physical force used while I'm around."

At the trial Kane testified on direct examination that there were no threats, promises or physical molestation of defendant. Defendant sought to introduce the answer given at the hearing for impeachment purposes. State's objection was sustained. This ruling is alleged to have been erroneous. We do not agree.

It is not impeaching in nature. In neither instance does Kane say force or threats were used. Defendant does not so claim. The only purpose of such testimony could be to use witness's "slip of the tongue" to cause the jurors to believe that on other occasions the Waterloo police department had used force and create a prejudice in their minds. Even if it were impeaching in nature, it would be an attempt to impeach on a collateral matter. "To impeach a witness by proof of inconsistent statements they must be material to the issue * * *; and at least inconsistent." French v. Universal C. I. T. Credit Corp., 254 Iowa 1044, 1048, 120 N.W.2d 476, 480; Hildenbrand v. Stinson, 241 Iowa 500, 41 N.W.2d 698, 701.

IV. The pertinent part of the trial court's instruction on self-defense is as follows:

"On the matter of self-defense you are instructed that where one is assaulted by another in such manner as to induce him to reasonably believe that he is at the time in either actual danger of death or of receiving great bodily harm, he is justified in defending himself against such assault although the danger may not be real but only apparent; and he may use such force and means to defend his person as may, in good faith, appear necessary to him as an ordinarily prudent person under all the facts and circumstances surrounding him at the time.

"Under the law of Iowa, in order to justify a killing on the ground of self-defense, four elements must be present:

"1. The defendant must not be the aggressor in provoking

the difficulty that results in the killing, or continuing the difficulty that results in the killing.

"2. He must retreat as far as he reasonably and safely can before taking his adversary's life.

"3. He must actually and honestly believe either that he is in imminent danger of death or great bodily harm, and that the action he takes is necessary to save himself. This danger need not be real, but only thought to be real in the defendant's mind, acting as a reasonable and prudent person under the circumstances.

"4. He must have reasonable grounds for such belief."

This is a proper instruction. State v. Johnson, 223 Iowa 962, 967, 274 N.W. 41; State v. Sedig, 235 Iowa 609, 614, 16 N.W.2d 247; State v. Emery, 236 Iowa 60, 66, 17 N.W.2d 854; State v. Haffa, 246 Iowa 1275, 1289, 71 N.W.2d 35.

 However, defendant claims he was entitled to a further instruction that he had no duty to retreat if the jury should find he was assaulted by the deceased by surprise or violence. He cites State v. Collins, 32 Iowa 36; State v. Linhoff, 121 Iowa 632, 97 N.W. 77; State v. Borwick, 193 Iowa 639, 187 N.W. 460. The Linhoff case held there was no duty to retreat from an assault within one's own dwelling. The Collins case was decided when the general rule required defendant to "retreat to the wall". The Borwick case involved an actual and violent assault on defendant while he was driving an automobile along a dangerous dropoff "without even the preliminary of a threat or challenge".

We need not decide what, if any, effect the modern rule, requiring defendant to retreat only so far as he reasonably and safely can, has on this exception to the duty to retreat as the present case is distinguishable on the facts.

Viewing the evidence in the light most favorable to defendant, it discloses that he knew deceased on prior occasions had carried and "pulled" a razor when in an altercation. He had been told deceased had beaten and raped a girl. He testified almost everyone at a party like this one had a knife or a razor of some sort.

He and deceased were attending an invitation party in the basement of the Chuck Pearson home. He accidentally stepped

on deceased's feet while he was dancing. A confrontation developed which was broken up without any blows being struck. Defendant heard deceased say words to the effect that, "We could go outside." Shortly thereafter Mr. Pearson came into the basement and told everyone to leave.

Defendant "went upstairs and out the side door of the house. He was walking down a walkway beside the house and saw cars parked in the driveway. As he was walking by, he looked to his right side and saw the deceased halfway in a car with the back seat pulled over. There was a light on the other people in the car. As he walked past, he watched out of the corner of his eye and kept walking. He remembered the statement that the deceased had made downstairs. He walked along the sidewalk which is alongside the house until he got to the front of the house and turned around to face the deceased who had started following him as he walked alongside of the house. He remembered the statement the deceased had made and didn't want to be jumped from the back and said to the deceased, 'Punk, do you want some parts of me?' He wanted to know what the deceased was going to do. The deceased started to walk to the deceased's right in a circle around the defendant. The defendant started to turn in order to remain facing the deceased because he did not want the deceased to get him from the back. While they were circling, they were approximately three feet apart and the defendant could see the deceased's hands at his sides. When the deceased started to circle him, he had been standing up on the walk and when the deceased finished circling him, the defendant was standing in the drive and the deceased was standing up on the lawn. The defendant at this time was facing the house after they got through circling. The deceased took a half a step toward him and indicated how the deceased at this time was holding his hands. He pushed the deceased in the chest area and back up on the lawn and then stepped back himself into the driveway at which point they were about five or six feet apart. At this point there were cars parked behind him and people around. There was a light on at the side door of the house. After he pushed the deceased, the deceased stuck his right hand into his

right pants pocket and started coming towards the defendant. The defendant reached for the gun in his right coat pocket. At this point he thought the deceased had a razor and was afraid of getting cut, having been cut before when he was down south at the age of seven on the left leg."

The circumstances satisfy the requirements for the self-defense instruction, State v. Brooks, 192 Iowa 1107, 1117, 186 N.W. 46; State v. Marish, 198 Iowa 602, 607, 200 N.W. 5; State v. Davis, 209 Iowa 524, 528, 529, 228 N.W. 37. We do not believe they disclose a situation requiring the instruction requested by the defendant. The elements of a sudden and violent assault by deceased are lacking. At no time did deceased commit any acts of violence against defendant. He did not even touch him after they had gone into the yard. Defendant's testimony negatives any element of surprise. The jury must, of course, consider the circumstances in determining how far defendant could reasonably and safely retreat before taking deceased's life and under the instruction must view the danger as it would have appeared to an ordinarily prudent person at the time. The instruction given adequately presented defendant's theory of the case to the jury. The requested instruction was not justified under the facts and circumstances here. See State v. Shannon, 214 Iowa 1093, 1099, 1100, 243 N.W. 507; State v. Borwick, 193 Iowa 639, 647, 187 N.W. 460.

V. The trial court instructed the jury: "The law does not require the State of Iowa to call every witness listed in the 'minutes of testimony' which is part of the county attorney's true information, and the fact that any witness was not called creates no inference or presumption as to what the testimony of such witness might or might not be."

Defendant objected to the last clause of this instruction claiming that failure to produce testimony of a witness within the control of the State raises a presumption that such testimony, if produced, would be adverse to it.

The instruction given is too broad as a general statement of the law. Under some circumstances the jury may properly draw an inference that the testimony of an uncalled witness would have been adverse to one of the parties. Lauer

v. Banning, 152 Iowa 99, 103, 131 N.W. 783; State v. Cotton, 240 Iowa 609, 33 N.W.2d 880, 889, 890; Miller v. Miller, 242 Iowa 706, 46 N.W.2d 732, 735; Paulsen v. Paulsen, 243 Iowa 51, 50 N.W.2d 567, 572; State v. Bolds, 244 Iowa 278, 55 N.W.2d 534, 538; In re Estate of Burrell, 251 Iowa 185, 100 N.W.2d 177, 184; In re Estate of Olson, 252 Iowa 471, 106 N.W.2d 345, 350; Hart v. Lundby, 258 Iowa 46, 137 N.W. 2d 642, 647; Grady v. Collins Transportation Co., 341 Mass. 502, 170 N.E. 2d 725, 726; United States v. Di Re, 332 U.S. 581, 68 S. Ct. 222, 92 L. Ed. 210; 31A C.J.S. 403, Evidence, section 156(3); 29 Am. Jur.2d 224, Evidence, section 180.

However, we agree with the Eighth Circuit Court of Appeals: "That any rule creating a presumption of this kind is to be applied with caution, * * * 'there must be a reason for such a supposition, and a factual area within which it may logically operate. The supposition must rise above the level of a mere possibility, * * *.' " Jenkins v. Bierschenk, 333 F.2d 421, 425.

No presumption arises when it is shown that the witness is equally available to either party or when the testimony that could be elicited from such witness would merely be cumulative. Grady v. Collins Transportation Co., 341 Mass. 502, 170 N.E.2d 725, 726-728; Richards v. United States, 107 U.S. App. D.C. 197, 275 F.2d 655, 656-658; Papalia v. United States, 243 F.2d 437; 31A C.J.S. 412, 415, Evidence, section 156(3); 29 Am. Jur.2d 226, Evidence, section 180; page 234, section 186; see annotation 135 A.L.R. 1375, 1376.

Defendant bases his argument on the failure of the State to call Walter Sykes, also known as Walter Williams. A summary of his testimony was attached to the information. Defendant points out that Sykes left the party at the same time deceased left and called deceased as he was getting into a car when defendant appeared. Deceased turned around and came back to Sykes.

An examination of the minutes of his testimony reveals that it would only have been cumulative to that of the other witnesses to the shooting. There was a large crowd of youngsters there and general agreement among all witnesses includ-

.ing defendant as to how the shooting occurred. There is nothing in the record to indicate Sykes could have testified any differently from the other witnesses.

Even if we assume he might have had some knowledge helpful to defendant not possessed by any other witness, he was as available to defendant as he was to the State. Defendant had the minutes of his testimony, he knew him personally and had heard testimony about his presence at the shooting. He saw him in the courtroom during the trial. The mere fact that his testimony was attached to the information does not make him more available to the State. The defendant or his counsel was free to interview him and call him as a witness. There was no showing Sykes refused to talk to defendant's counsel.

Under these circumstances, we hold it was not error for the court to give the instruction set out above. No unfavorable presumption or inference should have been drawn against the State for failure to call Walter Sykes.

▮ VI. On two separate occasions in his argument defendant's counsel started to draw inferences as to what Walter Sykes' testimony might have been. The court sustained objections by the State. As we have approved the instruction which told the jury the failure to call a witness raised no presumption or inference as to what his testimony might be, it follows that the court did not err in stopping defense counsel from drawing such inferences.

Counsel for defendant has given him exceptionally good representation both in the trial and on this appeal, however, we find no reversible error.—Affirmed.

All JUSTICES concur except RAWLINGS and BECKER, JJ., who dissent from Divisions V and VI and the result.

RAWLINGS, J.—Being unable to agree with the conclusion reached in Divisions V and VI of the majority opinion or the reasons given for it, I respectfully dissent.

Here the trial court gave an instruction to the effect failure by the State to call a witness listed as such on the information (indictment) creates no inference or presumption as to what the testimony of the absent witness might or might not be.

The majority concedes this is too broad as a general statement of the law.

In State v. Cotton, 240 Iowa 609, 625, 33 N.W.2d 880, this court specifically adopted the principle that where evidence which would properly be a part of a case is within the control of the party whose interest it would naturally be to produce it, and, without satisfactory explanation, he fails to so do, the jury may draw an inference that it would be unfavorable to him.

As best I have been able to determine we have never since, until now, abandoned the application of the foregoing rule in criminal cases. In that regard most of the cases and authorities cited by the majority relate to civil not criminal actions, and the rule in one is not necessarily applicable to the other.

Here the State gave no apparent explanation for its failure to call a named witness to testify.

I submit that under these circumstances there is a presumption, or at least an inference, the silent witness would have testified unfavorably to the prosecution. See State v. Cotton, supra; Billeci v. United States, 87 U.S. App. D.C. 274, 184 F.2d 394, 398, 399; and Underhill's Criminal Evidence, Fifth Ed., section 45, page 91.

Furthermore to say, as does the majority, a named State's witness is as available to defendant as to the prosecution serves to place an accused in an anomalous position.

Under the prior holdings of this court a defendant cannot determine in advance, by discovery procedure, the full substance or nature of the evidence which might be given by an identified witness for the prosecution. State v. Gates, 260 Iowa 772, 150 N.W.2d 617, and State v. District Court, 253 Iowa 903, 907–912, 114 N.W.2d 317.

The only possible relief available to a defendant in this direction is by use of statutory procedures allowed for the securing of a bill of particulars (Code section 773.6), or the taking of depositions (Code section 781.10).

But these are at best uncertain and restricted avenues of approach usually of little or no value to an accused. See State v. Schreck, 258 Iowa 218, 137 N.W.2d 914, 916, 917, and State

v. McClain, 256 Iowa 175, 180–182, 125 N.W.2d 764.

And any attempt by defendant to unofficially question the State's witnesses would undoubtedly be characterized during trial as witness tampering or intimidation.

The majority cannot mean counsel for an accused should blindly call a person identified by an indictment or information as a witness for the accused. This would normally be classified as nothing short of sheer stupidity and an indicia of incompetency.

Conceding the instruction given was too broad, I would reverse and remand for a new trial.

BECKER, J., joins in this dissent.