KENNETH A. ROGERS AND AUDREY J. ROGERS, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Rogers v. Commissioner
Docket No. 16645-85.
United States Tax Court
T.C. Memo 1986-529; 1986 Tax Ct. Memo LEXIS 79; 52 T.C.M. (CCH) 950; T.C.M. (RIA) 86529; October 27, 1986. *79 Held: In the light of the evidence before the Court, $50,000 received by petitioners in Sept. 1981 was a loan and not taxable income. Steven M. Chamberlain and William E. Whitley, for the petitioners. Willie Fortenberry, for the respondent. FEATHERSTON
MEMORANDUM FINDINGS OF FACT AND OPINION FEATHERSTON, Judge: Respondent determined a deficiency in the amount of $24,772 in petitioners' Federal income tax for 1981. Also at issue are additions to tax in the amount of $1,239 under section 6653(a)(1) [1] and for 50 percent of the interest due on an underpayment of $24,772 under section 6653(a)(2). The only substantive issue for determination is whether a $50,000 wire transfer to petitioners' personal bank account on September 11, 1981, represented a nontaxable loan or taxable income. FINDINGS OF FACT Petitioners Kenneth A. Rogers and Audrey J. Rogers, husband and wife, resided in Inverness, Florida, when their petition was filed. Petitioners filed a joint Federal income tax return for 1981 with the Internal Revenue Service Center, *80 Atlanta, Georgia. Petitioner Kenneth A. Rogers (Rogers or petitioner) is a union electrician and petitioner Audrey J. Rogers obtained her real estate broker's license in 1981 and began selling real estate at that time. Redlands Property
Petitioners bought a 5-acre tract of land in 1972 for $25,000 located in a section of Miami, Florida, known as the "Redlands" (hereinafter the Redlands property). In that year, petitioners built a residence and a guest house on the land, borrowing $52,000 for this purpose, and in 1976 began operating a small plant nursery on the Redlands property. The nursery, known as Rogers Wholesale, consisted of a 50 by 150 foot shade house where small plants were grown to make dish gardens. Petitioners sold the dish gardens to local florists and retailers. Although the nursery itself was not operational in 1981, petitioners planted 52 avocado threes on the Redlands property in that year for the purpose of obtaining an agricultural exemption from county real property taxes. The avocado trees were not producing at the time petitioners sold the Redlands property. Petitioners sold the Redlands property to Braulio Vila (Vila) and his wife on April 19, 1981. *81 The purchase agreement recites a purchase price of $250,000 for the Redlands property "unfurnished except stove, refrigerator, garbage compactor, dishwasher, water heater, and inventory of nursery stock according to Exhibit 'A' attached hereto." [2] The purchase agreement provides for a payment of $60,000 cash to petitioners at closing and a payment of $133,600 from the proceeds of the sale of the Vilas' property in Coral Gables, Florida (Coral Gables property). The agreement further provides that if the Vilas did not sell the Coral Gables property within 30 days after the effective date of the agreement, petitioners would have a power of sale over that property continuing until 6 months after conveyance of the Redlands property to the Vilas. If the Coral Gables property had not been sold at the end of the 6-month period, the agreement provided for a $133,600 payment to petitioners at that time either in cash or a combination of cash and a second mortgage on the Coral Gables property. The Coral Gables property was, in fact, not sold within 6 months of the closing (April 19, 1981). *82 Petitioners executed a quitclaim deed dated October 1, 1981, releasing their interest in the Coral Gables property to the Vilas. Petitioners received $73,000 cash from Vila in January 1982 and a second mortgage on the Coral Gables property with an outstanding balance of $60,600. Vila eventually paid $50,879 to petitioners in December 1984 as full payment in satisfaction of balance due on the second mortgage. At or about the time they sold the Redlands property, petitioners purchased 10 acres of land in Inverness, Florida (Inverness property) for $63,000 with the intention of building a new home. Chamara International, S.A.
Chamara International, S.A. (Chamara), is a Panamanian corporation organized on March 23, 1979, having as its initial directors and officers the following individuals: Lincoln Livingstone Cohen, Jorge Aurelio Cohen, and Rafael Fernandez Lara, all Panamanian domicilaries. Rafael Fernandez Lara (Fernandez Lara) was also designated as one of Chamara's resident agents. [3] In 1985, all of Chamara's stock was owned by Israel Noriega Rodriguez (Noriega Rodriguez). *83 On April 2, 1981, 17 days before closing on the Redlands property, petitioner and Vila, accompanied by Ramon Milian-Rodriguez (Milian-Rodriguez), [4] an accountant, flew via private Lear jet to Panama, then to Curacao in the Netherlands Antilles, and back to Florida in one day. Chamara Accounts at ABN Bank
Three accounts were eventually set up in Chamara's name at the ABN Bank as a result of petitioner's trip to Panama and Curacao on April 2, 1981. On April 21, 1981, two days after petitioners and the Vilas closed on the Redlands property, Imporexsa, a foreign corporation owned or controlled by Vila, transferred $51,400 into account number 46.09.689 in Chamara's name at ABN Bank (account #1). On September 3, 1981, $50,000 was wire transferred from account #1 to petitioners' *84 personal account at Mid-State Federal Savings and Loan in Ocala, Florida, where it was deposited on September 11, 1981. It is this $50,000 wire transfer that is the subject of dispute in this case. On October 6, 1981, petitioners executed a mortgage note in favor of Chamara in the amount of $50,000 bearing interest at 18 percent and payable in quarterly payments of $2,260.62 each for 120 quarters (30 years) commencing January 1, 1982. Petitioners also executed a mortgage deed on the Inverness property securing the $50,000 note. Petitioner sent the note and mortgage to Fernandez Lara. Petitioner wrote eight checks payable to Chamara, each in the amount of $2,260.62, which were deposited in ABN Bank accounts 46.09.689 (account #1), 46.60.331 (account #2), and 46.56.857 (account #3), as follows: Check Dated
Date Entered in Account
Account Number
Jan. 15, 1982
Feb. 2, 1982 46.56.857 (#3)
Apr. 14, 1982
Apr. 30, 1982
46.09.689 (#1)
July 18, 1982
Aug. 5, 1982 46.09.689 (#1)
Oct. 10, 1982
Oct. 29, 1982
46.56.857 (#3)
Jan. 16, 1983
Feb. 7, 1983 46.60.331 (#2)
July 12, 1983
July 27, 1983
46.60.331 (#2)
Oct. 12, 1983
Nov. 9, 1983 46.60.331 (#2)
Jan. 10, 1984
Feb. 24, 1984
46.56.857 (#3)
*85 Interest was credited to account #1 between April 1981, when Imporexsa transferred $51,400 into the account and September 1981, when $50,000 was transferred to petitioners' personal account. The interest earned and the excess deposit made by Imporexsa ($1,400) totaling $4,810.92 was transferred to account #2 on February 3, 1982, and then to account #3 on October 27, 1982. On November 18, 1982, $4,555.28 was transferred from account #1 to account #3 and account #1 was closed out. On February 11, 1983, $6,000 was disbursed to petitioner from account #3. [5]
On July 5, 1984, $6,781.86 was transferred from account #2 to account #3 and account #2 was closed out. On the same day, $16,995.27, which constituted the funds remaining in all three accounts, was disbursed from account #3 to Noriega Rodriguez. On March 19, 1985, petitioner made out a cashier's check in the amount of $50,000 payable to Chamara and received from the law offices of Miami attorney Jorge Rodriguez-Chomat (Chomat) a Satisfaction of Mortgage dated February 26, 1985, and signed by Noriega Rodriguez, acknowledging *86 payment of the $50,000 mortgage note to Chamara. OPINION Respondent determined in the notice of deficiency, and here contends, that the $50,000 wire-transferred to petitioners' account at the Mid-State Federal Savings and Loan on September 11, 1981, is taxable to petitioners as ordinary income. Respondent contends that the $50,000 was additional consideration for the sale of the Redlands property allocable to a plant nursery and inventory located thereon. In making this contention, respondent emphasizes that petitioners have the burden of proving that the $50,000 was not taxable income. Petitioners maintain that the $50,000 was a loan obtained from Chamara, a Panamanian corporation, which transferred the money to them through ABN, a bank in the Netherlands Antilles. Although petitioners steadfastly argue that they received the money as a loan, they make the alternative point that, if respondent is correct that the $50,000 was additional consideration for the Redlands property, it is taxable as capital gain rather than ordinary income. Whether the amount received by petitioners in 1981 from the ABN bank was a nontaxable loan or taxable income is a question of fact. Beaver v. Commissioner,55 T.C. 85, 91 (1970); *87 Fisher v. Commissioner,54 T.C. 905, 909 (1970). The factual inquiry is whether a bona fide debtor-creditor relationship existed between petitioners and Chamara. The resolution of that question depends on whether, at the time the money was advanced to petitioners, the lender intended to enforce repayment and petitioners intended to repay the money. Berthold v. Commissioner,404 F.2d 119, 122 (6th Cir. 1968), affg. a Memorandum Opinion of this Court. The burden of proof rests with petitioners. Rule 142, Tax Court Rules of Practice and Procedure. Petitioners rely on the stipulated documents and their own testimony. Respondent emphasizes mainly what petitioners failed to prove and the witnesses petitioners failed to call. The trial record is far from satisfactory, but we think a preponderance of the evidence supports petitioners' contention that the $50,000 was a loan. We begin with the fact that a proposed contract of sale as well as the executed contract dated March 25, 1981, expressly provide for a $250,000 purchase price for the Redlands property. These documents contain nothing to suggest that the price was actually $300,000. The purchase *88 price was to include cash of approximately $60,000, assumption of a $45,400 mortgage and an obligation by the purchaser (Vila) to pay petitioners $133,600 out of the proceeds of the sale of Vila's Coral Gables property. If the Coral Gables property was not sold within 30 days, petitioners were to have a 6-month power to sell it and apply the proceeds to the $133,600 obligation. At the end of 6 months, if the Coral Gables property was not sold, Vila was to discharge the obligation either in cash or by a combination of cash and a second mortgage on the Coral Gables property. The adjusted closing statement dated April 19, 1981, prepared by a lawyer named G. David Parrish, shows that the transaction was closed in accordance with the purchase and sale agreement. The Coral Gables property was not sold within the 6-month period, and in January 1982 Vila paid petitioners $73,000 in cash and gave them a second mortgage on the Coral Gables property to secure the payment of the balance of $60,600. The second mortgage was paid and satisfied in December 1984 when Vila paid petitioners the balance that he owed. Nothing in the manner in which this whole transaction was documented and handled *89 even suggests there was a secret side agreement for Vila to pay petitioners an additional $50,000 for the Redlands property. Petitioners planned to build a house near Inverness, located in central Florida, when they sold the Redlands property and they did so. The acreage on which they wished to build cost them about $63,000, a sum equal to almost all of the cash they obtained in 1981 out of the sale to Vila. Because Vila's purchase proposal called for a deferred payment of $133,600, petitioners decided they would need a construction loan of about $60,000 and were not sure they could obtain such a loan in the Inverness area where they had never lived. During the negotiations with respect to the Redlands property, Vila offered to assist petitioners in obtaining the needed loan from "interests that wanted to invest in Florida," and Rogers testified he, Vila, and Milian-Rodriguez went to Panama and the Netherlands Antilles on April 2, 1981, for the purpose of negotiating a $50,000 loan and a $10,000 line of credit from Chamara, a Panamanian corporation. The evidence is clear that this corporation was owned by Noriega Rodriguez in 1985, and he withdrew $16,955.27 from Chamara's ABN *90 account #3 in July 1984. No personal relationship between him and petitioners is shown by the evidence. The money used to make this loan was apparently supplied to Chamara by Imporexsa, a Panamanian corporation owned or controlled by Vila. The record contains no information on the arrangement between Imporexsa and Chamara but petitioners had no interest in either company. About 5 months later, on September 11, 1981, a wire transfer of $50,000 from Chamara's account in a bank in the Netherlands Antilles was credited to petitioners' bank account in Florida. On October 6, 1981, [6] petitioners executed a mortgage, which was recorded, securing a $50,000 note payable to Chamara in installments over a period of 30 years at the rate of $2,260.62 per quarter. Petitioner made eight quarterly payments between January 1982 and January 1984 but made no further payments in 1984 because he was unemployed. There is nothing in these documents or the manner in which the transaction was handled to suggest that the arrangement was not bona fide. *91 In late 1984, Vila paid off the balance of the deferred portion of the purchase price of the Redlands property, and petitioners asked Chomat to find out how much it would take to pay off the indebtedness to Chamara. Chamara agreed to accept $50,000, which petitioners paid by cashiers check, and Chamara gave petitioner a satisfaction of the mortgage, which was placed of record. Petitioners flatly deny that the $50,000 or any part of it was ever returned to them and there is no evidence to the contrary. Respondent thus asks us, in effect, to conclude that Vila agreed to pay $300,000 for the Redlands property even though the contract of purchase and sale states that the total price was $250,000. Respondent would also have us conclude that the note and mortgage to Chamara, though recorded on the land records, were bogus and meant nothing even though the record is reasonably clear that the payee of the note and the mortgagee was owned by Noriega Rodriguez who is not shown to have any connection with petitioners. [7] Respondent does not deny that petitioners mailed a $50,000 cashier's check to Chomat shortly before the satisfaction of mortgage was recorded but "denies that the $50,000 *92 was in fact a payment on any bona fide loan." The obvious financial risks of signing a contract to sell land for $50,000 less than the true purchase price, of executing and signing a bogus $50,000 note and mortgage to a corporation owned by someone else, and of transmitting to a designated representative a $50,000 cashier's check payable to a foreign corporation would logically seem to preclude giving respondent's theory that the $50,000 was additional consideration for the Redlands property much credence. But respondent, arguing that the $50,000 was taxable income, lists corroborating witnesses petitioners failed to call and emphasizes gaps in petitioners' proof. Respondent argues at great length that petitioners failed to produce Chomat, Vila, and Milian-Rodriguez as witnesses to corroborate petitioners' testimony with respect to the borrowing and repayment *93 of the $50,000 and contends that the Court should, therefore, infer that their testimony would be inconsistent with petitioners' position in this case. As to Chomat, counsel for respondent read into the record a stipulation stating what Chomat would testify if he were called as a witness. Given this stipulation, we see no ground for drawing any inferences adverse to petitioners from Chomat's failure to testify in court. Respondent admits that Milian-Rodriguez was in a Federal prison at the time of the trial; he was as readily available to respondent as to petitioners. There is no evidence to suggest he was biased against respondent or in favor of petitioner. As to Vila and Chomat as well, petitioners' counsel introduced in evidence subpoenas served on them, explained that they were not in the courtroom when one of them would have been expected to testify, stated that their testimony would be cumulative to that of petitioners, and rested petitioners' case. Respondent did not request enforcement of the subpoenas. There is no evidence to show that these individuals were biased against respondent, that they would have any reason to favor petitioners in their testimony, that they *94 were not as readily available to one party as to the other, or that there was any connivance with respect to the subpoenas. In these circumstances, we do not think any inferences adverse to petitioners' case may be properly drawn from the failure of these individuals to testify. See Kean v. Commissioner,469 F.2d 1183, 1187-1188 (9th Cir. 1972), affg. in part and revg. in part 51 T.C. 337 (1968); Spright v. State,254 Ind. 420, 260 N.E.2d 770, 772 (1970); State v. Parker,261 Iowa 88, 151 N.W.2d 505, 513 (1967). The factual situation is analogous to that in McGuire v. United States,171 F.2d 136 (D.C. Cir. 1948), where the trial court had refused to instruct a jury that "if you find a party has it peculiarly within his power to produce witnesses whose testimony would elucidate the transaction, the fact that he does not do it creates the presumption that the testimony, if produced would be unfavorable." 171 F.2d at 137. This requested instruction had reference to witnesses who had been subpoenaed by the Government and were present at the trial but were not put on the witness stand. The *95 court of appeals pointed out that there was no evidence to show that "the witnesses were peculiarly within the power of the Government to produce" or that the "defendant, if he deemed that their testimony would be favorable to him, could not have put them on the stand even though they were under subpoena by the Government." [8]171 F.2d at 137. Similarly, in the instant case, respondent made no effort to call Vila or Chomat or to compel their testimony by enforcement of the subpoenas. See also Bullock v. United States,265 F.2d 683, 693 (6th Cir. 1959). *96 The parties debate at length the question whether the accounts in the name of Chamara at the ABN Bank through which petitioners received the $50,000 in September 1981 and to which they made payments were loan accounts, as petitioners testified they understood the matter, or accounts which petitioners controlled. Respondent emphasizes that certain bank documents contain petitioners' signatures and describe petitioners as managers of the accounts, but respondent presented no testimony to explain the authority they had in that capacity under the law of the Netherlands Antilles. The record shows that petitioners made eight quarterly payments to the accounts between January 1982 and January 1984 in the amount of $2,260.62 each quarter. The record also shows that petitioners received $6,000 from the accounts in 1983, as part of the $10,000 line of credit arranged in April 1981 according to the testimony. But the undisputed facts are that the accounts were in the name of Chamara, and Noriega Rodriguez, a foreign national, was Chamara's sole shareholder at least as early as 1985 and he withdrew almost $17,000 from the accounts in July 1984. As sole shareholder of Chamara, he presumably *97 was in a position to control the accounts. There is certainly no evidence to the contrary. Respondent argues that the $50,000 petitioners obtained from Chamara was consideration for the nursery stock petitioners sold to Vila as part of the Redlands property sale. The record includes a proposed contract of purchase and sale, dated March 12, 1981, which petitioners did not sign, and it describes the Redlands property as "including all stock of plant nursery and necessary irrigation equipment and other tools and equipment for the operation of the plant nursery." The contract finally executed by petitioners and Vila described the property as including an "inventory of nursery stock according to Exhibit A attached hereto." The document stipulated in evidence does not have an Exhibit A attached to it, but the revised language appears to have merely made the original proposal more specific. According to the testimony, the "nursery" consisted at one time of an area of 50 by 150 feet covered by shade cloth where small plants used in making "dish gardens" (sold to local florists for $4 or $5 each) were grown and an area where petitioners in 1981 had planted 52 avocado trees, for which *98 they paid 75 cents per plant, as part of an effort to obtain a local agricultural tax exemption. Approximately 35 of the avocado plants survived but none of them had produced fruit before the property was sold. In addition, petitioners had six mango, two or three orange, and a couple of lime trees to produce fruit for their personal consumption. According to Rogers' testimony, the nursery was not in operation at the time of the sale and there were no negotiations for the allocation to the nursery of any of the sale price for the Redlands property. There is no evidence to the contrary. To decline to accept his testimony as true would require us to base findings of fact upon pure conjecture. Respondent makes much of the fact that the $50,000 petitioners paid to Chamara in March 1985 was not enough to cover the full amount of interest and principal (including the additional $6,000 petitioners received in 1983) then remaining [Missing Page] The record shows that petitioner is a working man, a union member, an electrician by trade. He bought the land on which his Redlands and Inverness residences were built and did much of the construction labor himself. From 1976 through 1980, *99 Mrs. Rogers on a part-time basis grew plants, placed groups of plants in decorative containers, and sold them to local florists to increase the family income.In 1981, prior to the sale of their Redlands property, she discontinued the nursery business and started selling real estate on a commission basis. Apart from his trip to Panama and the Netherlands Antilles to borrow the $50,000, a honeymoon, and a vacation in Jamaica, petitioners have never done any foreign travel. The fact that Rogers went to Panama and the Netherlands Antilles on April 2, 1981, with Milian-Rodriguez, who was later convicted of a catalog of crimes, is not enough to support a finding that the $50,000 he received as a carefully documented loan was taxable income. The trial record leaves unanswered questions but the preponderance of the evidence before the Court supports petitioners' contention that the $50,000 was a loan. The record provides no credible factual basis for the suspicion that petitioners actually sold the Redlands property for $300,000 rather than $250,000 and that the Chamara loan documents were [Illegible Word] that petitioners are not taxable on the [Illegible Word] concluded that the *100 $50,000 was not taxable [Illegible Word] no underpayment of tax. Therefore, the [Illegible Word] sections 6653(a)(1) and 6653(a)(2) are not [Illegible Word] foregoing, Decision will be entered for the petitioners.
Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended, unless otherwise noted.↩
2. No Exhibit "A," as referred to in the purchase agreement was attached to the copy admitted in evidence.↩
3. Although Chamara's corporate charter was translated into English and admitted in evidence as a stipulated exhibit, a page was missing from the document which presumably explains the purpose of the corporation.↩
4. Milian-Rodriguez was subsequently indicted and convicted on a long list of charges involving, among other things, money laundering and interstate travel in aid of racketeering and was sentenced to a total jail term of 35 years and a total cumulative fine of $6,495,000. Apart from this trip to Panama and the Netherlands Antilles, the record discloses no connection between him and petitioners.↩
5. $3,000 was debited to account #3 on Feb. 10, 1983, and credited to that account Aug. 31, 1983.↩
6. Respondent points to the time lag between the date of the receipt of the $50,000 and the execution of the mortgage. Admittedly, this is unusual. Respondent argues, however, that the $50,000 originated from Imporexsa, a Panamanian corporation owned by Vila. If true (as we have found to be the fact), during this delay in the execution of the mortgage, Vila personally owed petitioners $133,600 on the Redlands property and, therefore, had no real reason for concern about the delay in the completion of the documentation of the Chamara loan.↩
7. The parties stipulated that, if called as a witness, Chomat would testify that Noriega Rodriguez identified himself to Chomat as the owner of all of Chamara's stock, and the jurat on the satisfaction of mortgage executed Feb. 26, 1985, on behalf of Chamara states that Noriega Rodriguez was "100% shareholder" of Chamara.↩
8. The court added ( McGuire v. United States,171 F.2d 136, 138 (D.C. Cir. 1948)): It is customary and proper for either party to a suit to subpoena witnesses to cover every phase of a case which either probably or possibly will develop. It may then transpire that the phase upon which the witnesses were subpoenaed to testify did not develop or that the party who subpoenaed them considered that their testimony would be merely cumulative. For such reasons as this, or for many others, the party issuing the subpoenas has a perfect right to fail to use the witnesses without being subjected to any adverse inference therefrom provided the witnesses were equally accessible to the adverse party.↩